UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Holding a Criminal Term
Grand Jury Sworn in November 3, 2016

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No. _____ |
| | : | |
| | : | Indictment |
| v. | : | |
| | : | Violations: |
| | : | |
| JALIYA CHITRAN WICKRAMASURIYA, | : | 18 U.S.C. § 1343 |
| | : | (Wire Fraud) |
| | : | |
| Defendant. | : | 18 U.S.C. § 1956(a)(2)(A) |
| | : | (Laundering of Monetary |
| | : | Instruments) |
| | : | |
| | : | 18 U.S.C. § 1546(a) |
| | : | (False Statement in Immigration |
| | : | Application) |
| | : | |
| | : | FORFEITURE: |
| | : | 21 U.S.C. § 853; 18 U.S.C. § 982; |
| | : | 28 U.S.C. § 2461; 18 U.S.C. § 981 |

## INDICTMENT

The Grand Jury charges that:

At times material to this Indictment:

### Introduction

1.  Between 2008 and 2014, defendant Jaliya Chitran Wickramasuriya served as Ambassador from the Democratic Socialist Republic of Sri Lanka ("Sri Lanka") to the United States.

2.  While serving as the Ambassador, the defendant also owned and operated a company in Sri Lanka named Ceylon Royal Tea and Supplies Private Limited, and a company in

the state of Georgia named Ceylon Royal Tea and Supplies, LLC (Sri Lanka) (collectively "Ceylon Royal Tea").

3. Between in or about 2000 and 2012, the Sri Lankan embassy was located at 2148, Wyoming Ave., N.W., Washington D.C., 20008.

4. In 2012, the defendant was involved in selecting 3025 Whitehaven St., N.W., Washington, D.C. 20008 as the location for the new embassy.

5. In 2013, the defendant caused official funds from Sri Lanka to be wired to a HSBC bank account in Washington, D.C., which were used to purchase the new embassy.

6. "Embassy Consultant" was a lawyer and consultant who was an associate of the defendant.

7. Embassy Consultant owned and operated "Embassy Consultant Company A" and "Embassy Consultant Company A-1", both of which were registered in Washington, D.C., and shared the same business address in Washington, D.C. Embassy Consultant Company A and Embassy Consultant Company A-1 played no official role in the purchase of the embassy.

8. "Embassy Realtor" was a realtor. Embassy Realtor acted as the realtor for the government of Sri Lanka in the embassy purchase.

9. Embassy Realtor was employed by "Buyers Real Estate Company B," which offered real estate services. Buyers Real Estate Company B acted under the umbrella of "Buyers Real Estate Company B-1," a larger Washington, D.C.-based real estate company.

10. "Sellers Real Estate Company" was the real estate company that represented the sellers of 3025 Whitehaven Street, N.W.

11. "Closing Attorney" acted as the closing attorney for the government of the Republic of Sri Lanka when purchasing 3025 Whitehaven Street, N.W.

12. "Title Company Owner" owned and operated "Title Company," which was a title company. Title Company conducted the title check of 3025 Whitehaven Street, N.W. for the government of Sri Lanka. Title Company employed "Title Company Processor."

13. "Embassy Official 1" had an official role at the Sri Lanka Embassy in Washington, D.C.

14. "Embassy Official 2" had an official role at the Sri Lanka Embassy in Washington, D.C.

15. "Embassy Official 3" had an official role at the Sri Lanka Embassy in Washington, D.C. Embassy Official 3's duties included managing the embassy's operating budget and bank accounts, and providing accounting of monies spent by the Embassy to the Sri Lankan Ministry of Foreign Affairs.

16. "Sri Lankan Company C" was incorporated in Sri Lanka. Sri Lankan Company C is operated by "Sri Lankan Business Owner." Sri Lankan Company C played no official role in the purchase of the embassy.

17. "Sri Lankan Company D" was incorporated in Sri Lanka. Sri Lankan Company D played no official role in the purchase of the embassy.

18. "Defendant's Acquaintance" was an acquaintance of the defendant.

19. A HUD-1 settlement statement ("HUD-1 form") was a standard form used to itemize services and fees charged as part of the purchase of real estate.

**Financial Institutions and Accounts**

20. The following were financial institutions, as defined in Title 18, United States Code, Sections 20 and 1956(c)(6):

    a. HSBC;

   b. Alliance Bank; and

   c. Bank of America.

21. The defendant was a signatory over an account in the name of the Embassy of the Republic of Sri Lanka at HSBC, with account number ending in 1229 (the "Sri Lankan Government Bank Account").

22. Title Company had a business account at Alliance bank, with account number ending in 9838 (the "Title Company Bank Account").

23. The defendant was sole signatory over an account in the name of Ceylon Royal Tea at Bank of America, with account number ending in 0752 (the "Ceylon Royal Tea Account").

## COUNTS ONE AND TWO
## (WIRE FRAUD)
## (18 U.S.C. § 1343)

24. Paragraphs 1 through 24 are incorporated here.

### The Scheme

25. From in or around late-2012 to November 2013, the defendant Jaliya Wickramasuriya devised and intended to devise a scheme to defraud the government of Sri Lanka during the purchase of the embassy, and to obtain money by means of materially false and fraudulent pretenses, representations, and promises.

### Manner and Means

26. It was part of the scheme that:

Embassy Purchase

27. In late 2012, Embassy Realtor began to show homes to the defendant and Embassy Consultant as part of the search to purchase a new embassy for the government of Sri Lanka.

28. In or about October 2012, the defendant decided to purchase the property at 3025

4

Whitehaven Street, N.W., which would act as the new Sri Lankan embassy in Washington, D.C.

29. On or about October 8, 2012, Embassy Consultant emailed Embassy Realtor to introduce Embassy Realtor to Closing Attorney.

30. The agreed-upon purchase price for the property at 3025 Whitehaven Street N.W., was $6.25 million.

31. On or about January 9, 2013, Closing Attorney emailed Title Company Owner and Title Company Processor at the Title Company, to advise that the Sri Lankan government had appropriated $6.6 million for the purchase of the embassy. On January 14, 2013, Title Company Processor sent an email to Embassy Realtor, Closing Attorney, and Title Company Owner, which included a HUD-1 form. This HUD-1 form referenced the following payments to be made from the funds provided by the government of Sri Lanka:

    a. $187,500.00 commission payment to Sellers Real Estate Company;

    b. $187,500.00 commission payment to Buyers Real Estate Company B; and

    c. $332,027.35 payment which represented unaccounted for excess funds on the buyer's side of the form.

32. In follow-up emails Closing Attorney advised Title Company Owner and Title Company Processor that there would be excess funds associated with the real estate transaction, which Title Company would be responsible for retaining until those funds could be disbursed in accordance with the defendant's instructions.

33. On or about January 12, 2013, the defendant prepared a memorandum in which he instructed Title Company and Closing Attorney to disburse the unaccounted for $332,027.35 in funds to two third parties: Embassy Consultant Company A and Sri Lankan Company C, both of which had no role in the real estate transaction.

34. The defendant signed this memorandum.

35. In this memorandum, the defendant instructed Title Company to disburse $82,000.00 by wire or check to Embassy Consultant Company A and to disburse $250,000.00 by wire or check to Sri Lankan Company C.

36. On or about January 15, 2013, the defendant, using a non-embassy email account, emailed this memorandum, containing the disbursement instructions for the excess funds, to Closing Attorney.

37. On or about January 16, 2013, Embassy Realtor, Closing Attorney, Title Company Owner, Embassy Official 1, Embassy Official 2, Embassy Official 3, and a representative for Sellers Real Estate Company attended the closing for the purchase of the embassy. The closing occurred in Closing Attorney's Washington, D.C. office. The defendant did not attend the closing.

38. The HUD-1 form at closing referenced the following payments:

   a. $187,500.00 to Buyers Real Estate Company B-1;

   b. $187,500.00 to Sellers Real Estate Company;

   c. $82,027.35 to Embassy Consultant Company A; and

   d. $250,000.00 to Sri Lankan Company C.

39. The disbursements to Buyers Real Estate Company B-1 and Sellers Real Estate Company were legitimate commission payments to the respective realtors.

40. The disbursements to Embassy Consultant Company A and Sri Lankan Company C were not authorized by the government of Sri Lanka.

41. On or about January 17, 2013, Title Company successfully wired $82,027.35 to Embassy Consultant Company A from the Title Company Bank Account.

42. On or about January 17, 2013, Title Company attempted to wire $250,000.00 to Sri

Lankan Company C from the Title Company Bank Account; however, the wire was unsuccessful because an intermediary bank rejected it.

43. On or about January 18, 2013, Closing Attorney notified the defendant that the wire to Sri Lankan Company C could not be processed.

44. On or about January 20, 2013, the defendant, using his personal email account, sent an email to Closing Attorney that instructed Closing Attorney to mail a check to Sri Lanka, for $250,000.00, payable to Sri Lankan Company C.

45. On or about January 21, 2013, Closing Attorney advised the defendant that Title Company was more comfortable sending the check to defendant in Sri Lanka, as opposed to sending the check directly to Sri Lankan Company C.

46. On or about January 20, 2013, the defendant, using his personal email account, responded to Closing Attorney that, based on Title Company's request, the check should be mailed to:

> No2 Katuwana industrial Complex
> Katuwana Road, Homagama Colombo
> Sri Lanka

47. On or about January 20, 2013, Closing Attorney confirmed with the defendant that this was the address for Ceylon Royal Tea.

48. Based on these instructions from the defendant, which were conveyed through Closing Attorney, the Title Company sent a check in the amount of $250,000 to Sri Lankan Company C at the Colombo, Sri Lanka address that the defendant provided.

49. Initially, the defendant's efforts to have the $250,000.00 check cashed in Sri Lanka were not successful.

50. On or about March 19, 2013, Sri Lankan Business Owner directed Closing Attorney to prepare documentation indicating that Sri Lankan Company C was involved in the real estate

transaction so that the funds could be released to Sri Lankan Company C's Sri Lankan bank account. However, Sri Lankan Company C was not involved in the real estate transaction.

51. On or about March 19, 2013, the defendant, using his personal email account, told Closing Attorney not to send any emails regarding Sri Lankan Company C to the defendant's official Sri Lankan government email account.

52. On or about March 20, 2013, the Title Company Bank Account wired $250,000.00 to Sri Lankan Company C's Sri Lankan bank account, and the check was cashed at the Sri Lankan bank.

Discovery of Defendant's Scheme to Defraud the Government of Sri Lanka

53. Sometime after the embassy purchase was completed, Embassy Official 3 began investigating the transfer of the excess funds totaling $332,027.35. Upon conducing an audit of the transaction, Embassy Official 3 found no legitimate explanation for the provision of the excess funds, or the subsequent transfer of funds to Sri Lanka.

54. Embassy Official 3 approached Closing Attorney about the unexplained excess funds. Closing Attorney explained that all decisions regarding the disbursement of the excess funds were made by the defendant.

55. The defendant gave Embassy Official 3 a document labeled "Addendum to the Settlement Statement." The Addendum was undated, not written on official letterhead, and unsigned by the buyer or seller of the embassy property. The Addendum detailed payments made as "Commission to Agents" totaling $332,027.35. The Addendum stated that this purported commission was split evenly into two payments as follows – $166,013.68 to Buyers Real Estate Company B-1 and $166,013.68 to Sellers Real Estate Company.

56. In fact, no such commission payments totaling $332,027.35 were made to Buyers

Real Estate Company B-1 or Sellers Real Estate Company.

57. Embassy Official 3 concluded that neither Embassy Consultant Company A nor Sri Lankan Company C had provided legitimate services to the Sri Lankan embassy during the real estate transaction.

58. Embassy Official 3 subsequently notified Sri Lankan authorities about the unexplained payments totaling $332,027.35.

59. On or about August 20, 2013, Embassy Official 1 emailed Embassy Realtor to verify the commissions paid as part of the real estate transaction. Embassy Official 1 asked for clarification regarding the "Addendum to the Settlement Statement," which listed additional "Commission to Agents" in the amount to $332,027.35.

60. On or about August 20, 2013, Embassy Realtor replied by email and informed Embassy Official 1 that both realtors (Buyers Real Estate Company B-1 and Sellers Real Estate Company) had each only received the agreed upon commission amount of $187,500.00. Closing Attorney further stated that he was unaware of the realtors receiving any additional commissions totaling $332,027.35.

Defendant Replaced the Embezzled Funds after his Illegal Activity Was Discovered

61. In or around October 2013, the defendant approached Embassy Realtor with a request for Embassy Realtor to receive a money transfer of approximately $332,000. Based on prior communications that Embassy Realtor had with the defendant, Embassy Realtor hoped that this transfer was payment for a proposed renovation to the embassy, which needed to be changed from a residence to office space.

62. From October 21, 2013, through October 22, 2013, Embassy Realtor's bank account received the following wire transfers totaling $332,000:

9

    a. October 21, 2013 - $40,000.00 from Sri Lankan Company D. The note associated with this transfer stated: "Loan to Jaliya Wickramasuriya;"

    b. October 21, 2013 - $125,000.00 from Defendant's Acquaintance;

    c. October 21, 2013 - $32,000.00 from the defendant;

    d. October 21, 2013 - $73,265.00 from Embassy Consultant Company A; and

    e. October 21, 2013 - $61,735.00 from Embassy Consultant Company A-1.

63. On or about October 22, 2013, the defendant told Embassy Realtor that the embassy needed the funds that Embassy Realtor had just received in Embassy Realtor's bank account, to be transferred to the Sri Lankan Government Bank Account.

64. On or about October 22, 2013, Embassy Realtor had a cashier's check in the amount of $332,027.35 issued to the Embassy of Sri Lanka. The defendant personally collected the cashier's check from Embassy Realtor. The defendant subsequently deposited the cashier's check into the Sri Lankan Government Bank Account.

65. The defendant subsequently provided the Sri Lankan authorities with a letter from Embassy Realtor and addressed to the defendant, which stated that a cashier's check in the amount of $332,027.35 was being issued to the Sri Lankan embassy as a "final reimbursement." This letter was purportedly signed by Embassy Realtor. In fact, however, Embassy Realtor did not write or sign this letter.

66. On or about the dates set forth below, in the District of Columbia and elsewhere, the defendant, Jaliya Chitran Wickramasuriya, for the purpose of executing and attempting to execute the scheme described above, caused to be transmitted by means of wire communication in interstate commerce the signals and sounds described below:

| Count | On or About Date | Description |
|---|---|---|
| 1 | January 17, 2013 | $250,000.00 attempted wire from the Title Company Bank Account payable to Sri Lankan Company C. |
| 2 | March 20, 2013 | $250,000.00 wire from the Title Company Bank Account payable to Sri Lankan Company C. |

**(Wire Fraud, in violation of Title 18, United States Code, Section 1343)**

### COUNTS THREE AND FOUR
### (LAUNDERING OF MONETARY INSTRUMENTS)
### (18 U.S.C. § 1956(a)(2)(A))

67. Paragraphs 1 through 23 and 27 through 65 are incorporated here.

68. On or about the dates and in the amounts set forth below, in the District of Columbia and elsewhere, the defendant, Jaliya Chitran Wickramasuriya, did transport, transmit, or transfer, and attempt to transport, transmit, or transfer funds from a place in the United States to or through a place outside the United States, that is, the Republic of Sri Lanka, with the intent to promote the carrying on of a specified unlawful activity, including violations of section 1343 (relating to wire fraud), and an offense against a foreign nation involving the misappropriation, theft, and embezzlement of public funds by and for the benefit of a public official:

| Count | On or About Date | Description |
|---|---|---|
| 3 | January 17, 2013 | $250,000.00 attempted wire from the Title Company Bank Account payable to Sri Lankan Company C. |
| 4 | March 20, 2013 | $250,000.00 wire from the Title Company Bank Account payable to Sri Lankan Company C. |

**(Laundering of Monetary Instruments, in violation of Title 18, United States Code, Section 1956(a)(2)(A))**

### COUNT FIVE
### (FALSE STATEMENT IN IMMIGRATION APPLICATION)

**(18 U.S.C. § 1546(a))**

69. On or about March 25, 2014, in the District of Columbia, the defendant, Jaliya Chitran Wickramasuriya, did knowingly subscribe as true under penalty of perjury under section 1746 of Title 28, United States Code, a false statement with respect to a material fact in an application required by the immigration laws and regulations prescribed thereunder, to wit, in his Application to Register Permanent Residence or Adjust Status, that is, that the defendant had never, in or outside the United States, knowingly committed any crime of moral turpitude for which he had not been arrested, which statement the defendant then and there knew was false, in that the defendant had knowingly committed a crime of moral turpitude for which he had not been arrested.

**(False Statement in Immigration Application, in violation of Title 18, United States Code, Section 1546(a)).**

**FORFEITURE ALLEGATION**

1. Upon conviction of the offenses alleged in Counts One and Two, the defendant shall forfeit to the United States any property, constituting or derived from, proceeds the person obtained directly or indirectly as a result of these violations, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c). The United States will also seek a forfeiture money judgment against the defendant of at least $332,027.35.

2. Upon conviction of the offenses alleged in Counts Three and Four, the defendant shall forfeit to the United States any property, real or personal, involved in this offense, and any property traceable to such property, pursuant to 18 U.S.C. § 982(a)(1). The United States will also seek a forfeiture money judgment against the defendant of at least $332,027.35.

3. If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

      a.      cannot be located upon the exercise of due diligence;

      b.      has been transferred or sold to, or deposited with, a third party;

      c.      has been placed beyond the jurisdiction of the Court;

      d.      has been substantially diminished in value; or

      e.      has been commingled with other property that cannot be divided without difficulty;

the defendant shall forfeit to the United States any other property of the defendant, up to the value of the property described above, pursuant to Title 21, United States Code, Section 853(p)

**(Criminal Forfeiture, pursuant to 18 U.S.C. § 982(a)(1), 18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461(c); 21 U.S.C. § 853(p))**

A TRUE BILL:

FOREPERSON

*JESSIE K. LIU*
Attorney of the United States in
and for the District of Columbia

13