**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| | ) |
| | ) |
| v. | ) Criminal Action No. 1:18-120 (TSC) |
| | ) |
| | ) |
| JALIYA CHITRAN WICKRAMASURIYA, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**MOTION TO DISMISS THE INDICTMENT ON DIPLOMATIC IMMUNITY**
**GROUNDS AND MEMORANDUM OF LAW IN SUPPORT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 2

    I.   Legal Framework ........................................................................................... 2

    II.   Factual Background on Immunity Issues ...................................................... 3

    III.   Allegations in the Indictment ....................................................................... 8

        A.   Wire Fraud and Money Laundering ........................................................ 9

        B.   False Statement in an Immigration Application ...................................... 10

LEGAL STANDARD ....................................................................................................... 11

ARGUMENT ................................................................................................................... 12

    I.   Sri Lanka Has Not Waived Ambassador Wickramasuriya's Diplomatic Immunity ........ 12

    II. Ambassador Wickramasuriya Is Entitled to Residual Diplomatic Immunity Because the Indictment Relates to Acts that He Allegedly Performed in the Exercise of His Functions as a Member of the Sri Lankan Mission ................................................................. 18

        A. The Available Case Law, Including Authority from this District, Confirms that the Alleged Conduct Falls Within the Scope of Residual Diplomatic Immunity .................. 19

        B.   All Relevant VCDR Provisions Support Ambassador Wickramasuriya's Position ..... 23

        C.   The Government's Own Prior Positions Cast Doubt on Its Immunity Claims ............. 26

CONCLUSION ................................................................................................................. 27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aquamar, S.A. v. Del Monte Fresh Produce N.A., Inc.*,
    179 F.3d 1279 (11th Cir. 1999) ........................................................................13

*Arbaugh v. Y&H Corp.*,
    546 U.S. 500 (2006)..........................................................................................11

*Boanan v. Baja*,
    627 F. Supp. 2d 155 (S.D.N.Y. 2009)..............................................................22

*Brzak v. United Nations*,
    551 F. Supp. 2d 313 (S.D.N.Y. 2008)............................................19, 20, 21, 25

*Brzak v. United Nations*,
    597 F.3d 107 (2d Cir. 2010).............................................................11, 19, 25

*Dale v. Colagiovanni*,
    443 F.3d 425 (5th Cir. 2006) ...........................................................................14

*De Luca v. United Nations Org.*,
    841 F. Supp. 531 (S.D.N.Y. 1994) ..................................................................20

*De Sousa v. Dep't of State*,
    840 F. Supp. 2d 92 (D.D.C. 2012) ...................................................................12

*First Fidelity Bank v. Gov't of Antigua*,
    877 F.2d 189 (2d Cir. 1989)..............................................................................14

*Gunn v. Minton*,
    568 U.S. 251 (2013)..........................................................................................11

*Knab v. Republic of Georgia*,
    No. 97-cv-3118, 1998 WL 34067108 (D.D.C. May 29, 1998)................12, 16, 18

*Packsys, S.A. de C.V. v. Exportadora de Sal, S.A. de C.V.*,
    899 F.3d 1081 (9th Cir. 2018) ..............................................................14, 15, 17

*Phaneuf v. Republic of Indon.*,
    106 F.3d 302 (9th Cir.1997) ......................................................................14, 15

*SACE S.p.A v. Republic of Paraguay*,
    243 F. Supp. 3d 21 (D.D.C. 2017) ........................................................13, 14, 15, 16

*Swarna v. Al-Awadi*,
   622 F.3d 123 (2d Cir. 2010)..................................................................19, 21, 25

\*United States v. Al Sharaf*,
   183 F. Supp. 3d 45 (D.D.C. 2016) ................................................. *passim*

*United States v. Ballestas*,
   795 F.3d 138 (D.C. Cir. 2015) ...........................................................11

*United States v. County of Arlington*,
   669 F.2d 925 (4th Cir. 1982) .............................................................12

*United States v. Zhong*,
   No. 16-cr-614, 2018 WL 6186474 (E.D.N.Y. Nov. 26, 2018) ...............................12

\*Velasco v. Gov't of Indon.*,
   370 F.3d 392 (4th Cir. 2004) ............................................................14, 15

**Statutes**

22 U.S.C. § 254d............................................................................ *passim*

28 U.S.C. § 1605(a)(1)...............................................................................13, 15

28 U.S.C. § 1605(a)(2)...............................................................................13, 14, 15

**Rules**

Fed. R. Crim. P. 12(b)(1) ...........................................................................11

Fed. R. Crim. P. 12(b)(2) ...........................................................................11

**Other Authorities**

U.S. Dep't of State, Office of Foreign Missions, *Diplomatic* and *Consular
   Immunity: Guidance for Law Enforcement and Judicial Authorities* 6 (2019),
   https://www.state.gov/wp-content/uploads/2019/09/19-04499-
   DipConImm_v2_web.pdf ...................................................................2, 12, 17, 18

Vienna Convention on Diplomatic Relations, Apr. 18, 1961, 23 U.S.T. 3227 .................... *passim*

Defendant Jaliya Chitran Wickramasuriya, by and through his undersigned counsel, hereby submits this Motion to Dismiss the Indictment on Diplomatic Immunity Grounds and Memorandum of Law in Support and requests that the Court dismiss the case pursuant to 22 U.S.C. § 254d.  Defendant respectfully requests a hearing on this motion.

## INTRODUCTION

Like other former diplomatic agents accepted by the United States, Ambassador Wickramasuriya enjoys immunity from prosecution for "acts performed . . . in the exercise of his functions as a member of the [diplomatic] mission."  Vienna Convention on Diplomatic Relations ("VCDR"), art. 39.2, Apr. 18, 1961, 23 U.S.T. 3227.  Mr. Wickramasuriya served as Sri Lanka's Ambassador to the United States from 2008 to 2014.  Sri Lanka has not waived Ambassador Wickramasuriya's immunity, and the indictment relates solely to acts that he allegedly "performed . . . in the exercise of his functions as a member of the mission"—specifically, his role in the Sri Lankan government's purchase of a new embassy in 2012 and 2013.

The U.S. government extends privileges and immunities to the diplomatic agents of other governments not as a favor but because the United States expects those governments to extend the same privileges and immunities to U.S. diplomats.  In a reciprocal circumstance, the U.S. government would consider it entirely unacceptable for a foreign government to insist on relying on the apparent waiver of a U.S. Ambassador's diplomatic immunity by a U.S. government official who had acted without authority and for political purposes, where the U.S. government subsequently informed the foreign government that the official had acted beyond the scope of his authority and that the apparent waiver was invalid.  But that is what happened here.

Because Ambassador Wickramasuriya is entitled to diplomatic immunity, the Court lacks jurisdiction over the matter, and the indictment must be dismissed.

## BACKGROUND

### I.   Legal Framework

The VCDR provides for varying levels of immunity for sitting and former diplomatic agents, including ambassadors.  Because "[d]iplomatic missions are traditionally the principal communication link between the country that sends them and the host country," "the staffs of diplomatic missions (embassies) are afforded the highest level of privileges and immunities in the host country in order that they may effectively perform their important duties."  U.S. Dep't of State, Office of Foreign Missions, *Diplomatic* and *Consular Immunity: Guidance for Law Enforcement and Judicial Authorities* 6 (2019), https://www.state.gov/wp-content/uploads/2019/09/19-04499-DipConImm_v2_web.pdf (hereinafter "State Dep't Immunity Guidance").  "[T]he purpose of such privileges and immunities is not to benefit individuals but to ensure the efficient performance of the functions of diplomatic missions as representing States." VCDR, pmbl, cl. 4.

**Article 31.1** of the VCDR provides that a sitting diplomatic agent "shall enjoy immunity from the criminal jurisdiction of the receiving State."  With limited exceptions, "[h]e shall also enjoy immunity from its civil and administrative jurisdiction."  VCDR art. 31.1.  In addition, former diplomatic agents like Ambassador Wickramasuriya retain residual immunity for acts performed "in the exercise of [their] functions" as members of the mission.  **Article 39.2** provides:

> When the functions of a person enjoying privileges and immunities have come to an end, such privileges and immunities shall normally cease at the moment when he leaves the country, or on expiry of a reasonable period in which to do so, but shall subsist until that time, even in case of armed conflict.  However, with respect to acts performed by such a person in the exercise of his functions as a member of the mission, immunity shall continue to subsist.

The VCDR defines the "functions of a diplomatic mission" to include:

> (a) Representing the sending State in the receiving State;

2

(b) Protecting in the receiving State the interests of the sending State and of its nationals, within the limits permitted by international law;

(c) Negotiating with the Government of the receiving State;

(d) Ascertaining by all lawful means conditions and developments in the receiving State, and reporting thereon to the Government of the sending State;

(e) Promoting friendly relations between the sending State and the receiving State, and developing their economic, cultural and scientific relations.

VCDR art. 3.1.

**Articles 32.1 and 32.2** address waiver of immunity. Under Article 32.1, "[t]he immunity from jurisdiction of diplomatic agents . . . may be waived by the sending State." Under Article 32.2, such "[w]aiver must always be express."

Following the United States' ratification of the VCDR, Congress enacted the Diplomatic Relations Act of 1978. As relevant here, the Diplomatic Relations Act provides that "[a]ny action or proceeding brought against an individual who is entitled to immunity with respect to such action or proceeding under the Vienna Convention on Diplomatic Relations . . . shall be dismissed." 22 U.S.C. § 254d. A particular individual's immunity "may be established upon motion or suggestion by or on behalf of the individual, or as otherwise permitted by law or applicable rules of procedure." *Id.*

## II.   Factual Background on Immunity Issues

The charges in the indictment arise from alleged conduct in 2012 and 2013, during Mr. Wickramasuriya's tenure as Sri Lanka's Ambassador to the United States. Mr. Wickramasuriya served as Ambassador from 2008 until 2014. Indictment, ECF No. 1, ¶ 1. Following his term as Ambassador, Mr. Wickramasuriya was granted permanent resident status and has continued to live

in the United States.  He currently resides in Arlington, Virginia with his wife, a U.S. citizen.  His son and daughter have also become naturalized U.S. citizens.

In the fall of 2017, upon learning that the U.S. government had begun investigating the circumstances surrounding the embassy purchase, Ambassador Wickramasuriya sought assurance from the Sri Lankan government that his immunity remained intact.  On **October 6, 2017**, Prasad Kariyawasam, then Secretary to the Ministry of Foreign Affairs, confirmed in a letter to Ambassador Wickramasuriya's attorney that the Ambassador continued to enjoy diplomatic immunity "with regard to those acts that were performed in the exercise of his functions as a member of the Embassy of Sri Lanka to the United States."  **Decl. of Shavindra Fernando ("Fernando Decl.") Ex. A**, Letter from Prasad Kariyawasam to Mr. W J Shavindra Fernando (Oct. 6, 2017).  Mr. Kariyawasam further confirmed that "[t]he Government of Sri Lanka has not waived any immunities of Mr. Jaliya Chitran Wickramasooriya may have enjoyed or continue to enjoy." *Id.*  The letter is on Ministry of Foreign Affairs letterhead and states that Mr. Kariyawasam was writing at the direction of Minister of Foreign Affairs Tilak Marapana.[1]  *Id.*

On **October 23, 2017**, the U.S. government requested waiver of Ambassador Wickramasuriya's immunity.  *See* **Fernando Decl. Ex. B**, Document No. L/POL/33 (Oct. 23, 2017) (referencing Note Verbale No: 756 from the United States, dated October 23, 2017).  That same day—indeed, only hours later—a Sri Lankan official transmitted a document captioned "L/POL/33" to unknown sources in the U.S. government, purporting to waive Ambassador Wickramasuriya's immunity.[2]  *See id.*  The document follows the format of a diplomatic note,

---

[1] Sri Lanka's Foreign Ministry changed its name during the relevant period.  References in this motion to the Foreign Ministry, Ministry of Foreign Affairs, and Ministry of Foreign Relations relate to the same entity.

[2] Counsel for Ambassador Wickramasuriya received a copy of the document attached as Exhibit B to the Fernando Declaration from an Assistant U.S. Attorney assigned to the case at the time.

stating that it is from the "Ministry of Foreign Affairs of the Democratic Socialist Republic of Sri

Lanka" and addressing "the Embassy of the United States of America." *Id.* The document is

signed by Mr. Kariyawasam, although the signature is not legible. **Fernando Decl. ¶ 6**. It reads

in relevant part:

> The Ministry of Foreign Affairs wishes to assure the assistance of the Government
> of the Democratic Socialist Republic of Sri Lanka, with the ongoing investigations
> of Mr. Wickremasooriya and accordingly waive off any immunity Mr.
> Wickremasooriya enjoys with regard to such investigations, including but not
> limited to testimonial immunity and immunity from the criminal, administrative
> and civil jurisdiction of the United States.

**Fernando Decl. Ex. B**, Document No. L/POL/33 (Oct. 23, 2017).

Ambassador Wickramasuriya promptly challenged the purported waiver of immunity in

the Sri Lankan courts. **Fernando Decl. ¶ 7**. On December 8, 2017, Ambassador Wickramasuriya

filed a case in the Sri Lankan Court of Appeal. *Id.* The Court of Appeal dismissed the case on

March 29, 2018. *Id.* Ambassador Wickramasuriya appealed the Court of Appeal's decision to the

Sri Lankan Supreme Court on April 23, 2018. *Id.* ¶ 8. Although the Supreme Court has postponed

the case repeatedly due to heavy judicial caseloads and the effects of the global pandemic, it

remains pending before that court. *Id.* ¶¶ 9, 11.

In the meantime, the U.S. government filed this case under seal. *See* Indictment, ECF No.

1 (May 1, 2018). At the government's request, this Court unsealed the case in December 2018.

In **January 2020**, Sri Lankan President Gotabaya Rajapaksa ordered the Sri Lankan

government to investigate the potential political victimization of certain public officers, employees

of public corporations, and members of the armed forces and police service between January 2015

and November 2019. **Fernando Decl. Ex. C**, Proclamation by Sri Lankan President Gotabaya

Rajapaksa (Jan. 9, 2020); *see also* **Fernando Decl. ¶ 12**. Ambassador Wickramasuriya was one

of the former public officials identified for inclusion in this review. **Fernando Decl. ¶ 13**.

5

Ultimately, the Presidential Secretariat and Foreign Ministry conducted an investigation of the purported waiver of Ambassador Wickramasuriya's immunity, *id.* ¶ **14**, and concluded that it was illegitimate. Under Sri Lankan law, the President must order the waiver of an Ambassador's diplomatic immunity, since Ambassadors are appointed under the powers of the President in Article 33(2)(d) of the Sri Lankan Constitution. *Id.* ¶¶ **15-16**.

While the investigation was pending, Ambassador Wickramasuriya sought information from the government under Sri Lanka's Right to Information Act. On **February 20, 2020**, Iresha N. Weerasekara, Senior Assistant Secretary to the President, described the results of this review as follows in a letter to Ambassador Wickramasuriya's attorney:

> According to our records, there is no decision and/or instruction issued by His Excellency, the President, Maithripala Sirisena between 27th September 2017 and 23rd October 2017 to waive the immunity of Mr. Jaliya Wickramasooriya, former Ambassador to the United States.

**Fernando Decl. Ex. D**, Letter from Iresha Weerasekara to Upendra Gunasekara (Feb. 20, 2020).

Following the investigation by the Presidential Secretariat and Foreign Ministry, the Sri Lankan government concluded that the purported waiver of Ambassador Wickramasuriya's immunity was illegitimate. The Sri Lankan Foreign Ministry has communicated this official conclusion to the United States. On **July 2, 2020**, the Sri Lankan Ministry of Foreign Relations issued Diplomatic Note No. L/POL/33(VII) to the U.S. Embassy, confirming that the purported waiver of immunity in Diplomatic Note No. L/POL/33 was illegitimate and that the Sri Lankan government considered the note communicating this purported waiver to be withdrawn. The July 2 note reads in relevant part:

> Although, the aforesaid Note Verbale appears to have been issued by the Ministry of Foreign Relations on the basis that such instructions have been issued by former President, His Excellency Maithripala Sirisena, the Presidential Secretariat and Ministry of Foreign Relations has been able to verify that no records are available in both offices to prove that former President has issued such instructions.

6

> Based on above mentioned observations, the Ministry of Foreign Relations is of the view that the said waiver is not legitimate and hence the aforesaid Note Verable [*sic*] No. L/POL/33 dated 23rd October, 2017 is withdrawn.

**Fernando Decl. Ex. E**, Diplomatic Note No. L/POL/33(VII) (July 2, 2020).  A letter from Ravinatha Aryasinha, Secretary to the Ministry of Foreign Relations, to Dr. P.B. Jayasundera, Secretary to the President, confirms that the Ministry of Foreign Relations issued Diplomatic Note No. L/POL/33(VII) in response to instructions from the Sri Lankan President's Office.  **Fernando Decl. Ex. E**, Letter from Ravinatha Aryasinha to Dr. P.B. Jayasundera (July 2, 2020).

On **August 19, 2020**, the U.S. State Department responded by diplomatic note.  **Fernando Decl. Ex. F**, Diplomatic Note from the U.S. Department of State (Aug. 19, 2020).  This note expressed the view that Sri Lanka had already "waived any immunity Mr. Jaliya Chithran Wickramasooriya might otherwise enjoy with regard to the criminal proceeding pending in the United States District Court for the District of Colombia [*sic*]" and asserts that "a sending State cannot revoke a waiver of immunity once it has been given." *Id.* at 1-2.  The note further states that "the U.S. government relied on the Democratic Socialist Republic of Sri Lanka's waiver and has taken steps consistent with the waiver." *Id.* at 2.

On **September 8, 2020**, the Embassy of Sri Lanka replied by diplomatic note.  **Fernando Decl. Ex. G**, Diplomatic Note TPN No. US/ADMIN/INQ/2020 from the Embassy of Sri Lanka to the U.S. Department of State (Sept. 8, 2020).  The government of Sri Lanka forcefully reiterated its position and sought to correct the State Department's apparent misconception that Sri Lanka was attempting to revoke a valid waiver of immunity.  Instead, as the note clarifies, the Sri Lankan government's position is that no waiver of Ambassador Wickramasuriya's immunity ever occurred.  The note explains:

> The Embassy of Sri Lanka wishes to inform the US Department of State, that the relevant authorities in Sri Lanka have taken note of the contents of the aforesaid Note Verbale of the U.S. Department of State.  The relevant Sri Lankan authorities continue to hold the view that Note Verbale No. L/POL/33 dated 23rd October 2017, is not valid and therefore, diplomatic immunity of Mr. Wickramasuriya has never been waived, as due internal process has not been followed prior to issuing the said Note.  Hence, the decision taken at the highest government level to withdraw Note Verbale No. L/POL/33 dated 23rd October 2017, is reiterated.
>
> The Embassy of Sri Lanka further requests that the contents of Note Verbale No. L/POL/33 dated 23rd October 2017, so withdrawn is not used in any manner contrary to the position of the Government of Sri Lanka reflected herein.
>
> Further, the Embassy of Sri Lanka would appreciate receiving the fullest cooperation of the US Department of State in this regard.

*Id.*

The Sri Lankan government has also informed the Sri Lankan Supreme Court that the purported waiver is illegitimate.  In those proceedings, the Attorney General, appearing on behalf of the state, has confirmed that the immunity waiver was improper and illegal.  **Fernando Decl. ¶ 10**.  The next court date in Ambassador Wickramasuriya's case is set for November 2, 2020.  *Id.* ¶ 11.

This case has been pending for nearly two years since it was unsealed.  The Court has patiently postponed proceedings while the above factual developments on the immunity issue—some of which required action by the Sri Lankan government or courts—unfolded.  Now that the Sri Lankan government has confirmed that the purported waiver of Ambassador Wickramasuriya's immunity was invalid, the question of dismissal on immunity grounds is ripe for decision.

## III.    Allegations in the Indictment

The charges in this case arise from Ambassador Wickramasuriya's alleged role in the Sri Lankan government's purchase of a new embassy in 2012 and 2013, while he was serving as Sri Lanka's Ambassador to the United States.  Specifically, the indictment charges Ambassador

Wickramasuriya with two counts of wire fraud pursuant to 18 U.S.C. § 1343, two counts of money laundering pursuant to 18 U.S.C. § 1956(a)(2)(A), and one count of making a false statement in an immigration application pursuant to 18 U.S.C. § 1546(a).  The indictment also seeks forfeiture pursuant to 21 U.S.C. § 853, 18 U.S.C. § 982, 28 U.S.C. § 2461, and 18 U.S.C. § 981.

### A.  Wire Fraud and Money Laundering

The indictment alleges that, from in or around late 2012 to November 2013, Ambassador Wickramasuriya "devised and intended to devise a scheme to defraud the government of Sri Lanka during the purchase of the embassy, and to obtain money by means of materially false and fraudulent pretenses, representations, and promises." Indictment, ECF No. 1,  ¶ 25.  According to the indictment, in late 2012, a realtor showed homes to Ambassador Wickramasuriya "as part of the search to purchase a new embassy for the government of Sri Lanka."  *Id.* ¶ 27; *see also id.* ¶ 4. In or about October 2012, Ambassador Wickramasuriya "decided to purchase the property at 3025 Whitehaven Street, N.W., which would act as the new Sri Lankan embassy in Washington, D.C." *Id.* ¶ 28.  The agreed-upon purchase price for the property was $6.25 million, but the Sri Lankan government appropriated $6.6 million, leaving excess funds.  *Id.* ¶¶ 30-31; *see also id.* ¶ 5 ("In 2013, the defendant caused official funds from Sri Lanka to be wired to a HSBC bank account in Washington, D.C., which were used to purchase the new embassy.").

The charges relate to two allegedly unauthorized attempted disbursements from the excess funds: a "250,000.00 attempted wire from the Title Company Bank Account payable to Sri Lankan Company C" on January 17, 2013 and a "$250,000 wire from the Title Company Bank Account payable to Sri Lankan Company C" on March 20, 2013.  *Id.* ¶¶ 66, 68.  Specifically, the indictment alleges that Ambassador Wickramasuriya prepared a signed memorandum and provided other

9

instructions directing Title Company to disburse $250,000 to Sri Lankan Company C.  *Id.* ¶¶ 33-36.

At least three other embassy officials were involved in the transaction on behalf of the government of Sri Lanka.  *See id.* ¶ 37 (listing officials who attended the closing).  In addition, Sri Lanka retained a team of real estate professionals including Closing Attorney and Title Company, who were responsible for preparing draft and final HUD-1 settlement statements, calculating the excess funds, and ultimately disbursing the excess funds.  *Id.* ¶¶ 8-9, 11-12, 31-32, 37, 41-42, 48, 52; *see also id.* ¶ 19 ("A HUD-1 settlement statement . . . was a standard form used to itemize services and fees charged as part of the purchase of real estate.").  The closing occurred on or about January 16, 2013 at Closing Attorney's office.  *Id.* ¶ 37.  "Embassy Realtor, Closing Attorney, Title Company Owner, Embassy Official 1, Embassy Official 2, Embassy Official 3, and a representative for Sellers Real Estate Company attended the closing for the purchase of the embassy."  *Id.*  Ambassador Wickramasuriya did not attend the closing.  *Id.*

According to the indictment, Ambassador Wickramasuriya coordinated replacement of the funds after the scheme was discovered.  *Id.*  ¶¶ 53-65.  There was no loss to the government of Sri Lanka (or any other party).

**B.  False Statement in an Immigration Application**

The indictment charges Ambassador Wickramasuriya with an immigration violation arising from the same events.  It alleges that "on or about March 24, 2015," Ambassador Wickramasuriya stated in an Application to Register Permanent Residence or Adjust Status that he had never "knowingly committed any crime of moral turpitude for which he had not been arrested, which statement the defendant then and there knew was false, in that the defendant had knowingly committed a crime of moral turpitude for which he had not been arrested."  *Id.* ¶ 69.

For purposes of the argument below, we consider this count to rise or fall with the underlying substantive counts.

## LEGAL STANDARD

Pursuant to Federal Rule of Criminal Procedure 12(b), a defendant "may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits," including a "motion that the court lacks jurisdiction." Fed. R. Crim. P. 12(b)(1) & (2). "'Federal courts are courts of limited jurisdiction,' possessing 'only that power authorized by Constitution and statute.'" *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). Where the court lacks subject-matter jurisdiction over a case, it must dismiss the action. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506-07 (2006).

This Court's jurisdiction over federal criminal prosecutions is limited by the Diplomatic Relations Act of 1978, which provides in relevant part that "[a]ny action or proceeding brought against an individual who is entitled to immunity with respect to such action or proceeding under the Vienna Convention on Diplomatic Relations . . . shall be dismissed." 22 U.S.C. § 254d. A particular individual's immunity "may be established upon motion or suggestion by or on behalf of the individual, or as otherwise permitted by law or applicable rules of procedure." *Id.*

When considering a motion to dismiss for lack of jurisdiction, a court ordinarily "assumes the truth of th[e] factual allegations" contained in the criminal indictment. *United States v. Ballestas*, 795 F.3d 138, 149 (D.C. Cir. 2015) (citing *Boyce Motor Lines v. United States*, 342 U.S. 337, 343 n.16 (1952)). The court must conduct the immunity analysis, however, "without judging whether the underlying conduct actually occurred, or whether it was wrongful." *Brzak v. United Nations*, 597 F.3d 107, 113 (2d Cir. 2010).

11

**ARGUMENT**

**I.    Sri Lanka Has Not Waived Ambassador Wickramasuriya's Diplomatic Immunity**

Diplomatic immunity is for the benefit of the sending state, not the individual diplomat. *De Sousa v. Dep't of State*, 840 F. Supp. 2d 92, 107 (D.D.C. 2012); *United States v. Zhong*, No. 16-cr-614, 2018 WL 6186474, at *3 (E.D.N.Y. Nov. 26, 2018).  "[T]he privilege extended to an individual diplomat is merely incidental to the benefit conferred on the government he represents." *United States v. County of Arlington*, 669 F.2d 925, 930 (4th Cir. 1982).  Consistent with this principle, only the sending state may waive the immunity of a diplomatic agent, and such waiver "must always be express."  VCDR art. 32.1, 32.2; *see also Knab v. Republic of Georgia*, No. 97-cv-3118, 1998 WL 34067108, at *2 & n.2 (D.D.C. May 29, 1998).  The burden of establishing waiver "lies on the party asking the Court to assert jurisdiction," which in this case is the U.S. government.  *Knab*, 1998 WL 34067108, at *2 (citing *Hellenic Lines, Inc. v. Moore,* 345 F.2d 978, 980 n.3 (D.C. Cir. 1965)).

Sri Lanka has confirmed that Ambassador Wickramasuriya's immunity remains in effect. **Fernando Decl. Ex. G**, Diplomatic Note TPN No. US/ADMIN/INQ/2020 from the Embassy of Sri Lanka to the U.S. Department of State (Sept. 8, 2020).  As the receiving state, the United States has no authority to override a sending state's decision to retain diplomatic immunity under the VCDR.  At most, it may declare a sitting diplomat *persona non grata* and expel the person from the country.  *See* State Dep't Immunity Guidance at 10.  These limitations are consistent with the State Department's acknowledgment that "sending countries 'own' the[] privileges and immunities" set forth in the VCDR.  *Id.*

The record shows that no legitimate waiver of Ambassador Wickramasuriya's immunity ever occurred.  Although a Sri Lankan official *purported* to waive Ambassador Wickramasuriya's

immunity in a document dated October 23, 2017, that official did so without valid authority. **Fernando Decl. Exs. B-E, G**; **Fernando Decl. ¶¶ 10, 14-16**.  Sri Lanka determined that the purported waiver was invalid following an investigation by its Presidential Secretariat and Foreign Ministry.  **Fernando Decl. Ex. C, E, G**; **Fernando Decl. ¶¶ 14**.  The President's Office subsequently directed the Foreign Ministry to communicate that information to the United States. **Fernando Decl. Ex. E**.

U.S. courts repeatedly have held that a foreign official must have actual authority to waive immunity on a sovereign's behalf.  In *SACE S.p.A v. Republic of Paraguay*, for example, Judge Jackson "agree[d] with Paraguay that the waiver provision of the FSIA requires actual authority to waive the foreign state's sovereign immunity."  243 F. Supp. 3d 21, 24 (D.D.C. 2017) (interpreting 28 U.S.C. § 1605(a)(1)).  Because the FSIA's waiver provision authorizes jurisdiction where "the ***foreign state*** has waived its immunity either explicitly or by implication," 28 U.S.C. § 1605(a)(1) (emphasis added), the court considered whether the term "foreign state" includes "only the agents . . . that the foreign state has actually authorized to waive sovereign immunity, or whether it also includes those who merely appear to have such waiver authority," *SACE*, 243 F. Supp. 3d at 35.  This analytical framework applies equally to the waiver of diplomatic immunity, since the decision to waive or retain immunity rests with "the sending State."  VCDR art. 32.1; *see also Aquamar, S.A. v. Del Monte Fresh Produce N.A., Inc.*, 179 F.3d 1279, 1296 n.41 (11th Cir. 1999) ("Diplomatic immunity, like sovereign immunity, belongs to the foreign state and may only be waived by the state itself.").

In interpreting the meaning of "foreign state" for purposes of the FSIA's waiver provision, the court in *SACE* looked to precedents under the FSIA's "commercial activity" exception, which also uses the term "foreign state."  *SACE*, 243 F. Supp. 3d at 35; *see* 28 U.S.C. § 1605(a)(2)

(providing that "[a] foreign state shall not be immune" from jurisdiction where the action is based upon certain commercial activities "of the foreign state" or "carried on . . . by the foreign state"). Although the waiver and commercial activity exceptions are distinct, both require the court to make a preliminary determination of what the "foreign state" *is*—including, in some cases, "whether an individual agent of a foreign state" has "the state's authority to engage in an act that triggers an FSIA exception to the state's sovereign immunity." *SACE*, 243 F. Supp. 3d at 34 (emphasis omitted); *see also id.* at 37 (explaining that the same analysis applies to questions of an individual agent's authority under both exceptions). Applying these principles in *SACE*, the court relied on "the weight of judicial authority regarding the FSIA's commercial-activity exception" to hold that an official's "apparent authority is [not] enough to trigger" a waiver of sovereign immunity. *Id.* at 37.[3]

The Ninth Circuit elaborated on these issues in a recent decision addressing both the commercial activity and waiver exceptions to the FSIA. *See Packsys, S.A. de C.V. v. Exportadora de Sal, S.A. de C.V.*, 899 F.3d 1081 (9th Cir. 2018). In a prior case, the court had held that "the conduct of a foreign state's agent only triggers the commercial activity exception when the agent acts with the actual—as opposed to apparent—authority of the sovereign state." *Id.* at 1088 (citing

---

[3] The Fourth, Fifth, and Ninth Circuits have long held that actual authority is required to authorize jurisdiction under the commercial activity exception. *See, e.g.*, *Velasco v. Gov't of Indon.*, 370 F.3d 392, 400 (4th Cir. 2004) (holding that "the commercial activity exception [to the FSIA] may be invoked against a foreign state only when its officials have actual authority"); *Phaneuf v. Republic of Indon.*, 106 F.3d 302, 308 (9th Cir.1997) ("[A]n agent must have acted with actual authority in order to invoke the commercial activity exception against a foreign state."); *Dale v. Colagiovanni*, 443 F.3d 425, 429 (5th Cir. 2006) (holding that "an agent's acts conducted with the apparent authority of the state [are] insufficient to trigger the commercial exception to FSIA"). The Second Circuit reached the opposite conclusion in *First Fidelity Bank, N.A. v. Gov't of Antigua*, 877 F.2d 189, 195-96 (2d Cir. 1989) (holding that apparent authority could bind the Antiguan government to a promissory note signed by its ambassador), but the Fourth, Fifth, and Ninth Circuits expressly considered and rejected this reasoning in the decisions above. In any case, as the court in *SACE* explained, "it is far from clear that the Second Circuit would permit the apparent-authority standard to carry the day with respect to an agent's express waiver of sovereign immunity purportedly on behalf of the foreign state." *SACE*, 243 F. Supp. 3d at 37.

*Phaneuf v. Republic of Indon.*, 106 F.3d 302, 307 (9th Cir. 1997)).  In *Packsys*, the court reaffirmed

this rule and extended it to the FSIA waiver context.  *Id.* at 1088-94.  The court described the

reasoning behind the rule as follows:

> As we explained in *Phaneuf*, "[a]ll three clauses of the [FSIA's commercial activity] exception require 'a commercial activity *of the foreign state*.'"  *Id.* at 307 (quoting 28 U.S.C. § 1605(a)(2)).  But "[w]hen an agent acts beyond the scope of his authority, . . . that agent is not doing business which the sovereign has empowered him to do," and "the agent's unauthorized act [therefore] cannot be attributed to the foreign state."  *Id.* at 308 (internal quotation marks omitted).  That is, acts undertaken without actual authority are not acts "of the foreign state," 28 U.S.C. § 1605(a)(2), regardless of whether the agent appeared to have the authorization of the sovereign.

*Packsys,* 899 F.3d at 1088-89.

In the context of waiver by a sovereign, the Ninth Circuit explained, this reasoning "applies

with at least equal force."  *Id.* at 1093.  "If acts by unauthorized agents do not constitute 'activity

*of* the foreign state," under Section 1605(a)(2), they also cannot effect a waiver *by* 'the foreign

state' under Section 1605(a)(1)."  If anything, as the courts in both *Packsys* and *SACE* recognized,

the rationale is more persuasive in the waiver context because "a waiver of sovereign immunity

speaks directly to the foreign sovereign's willingness to accede to the jurisdiction of another

country's courts."  *Id.* (quoting *SACE*, 243 F. Supp. 3d at 36).

Ambassador Wickramasuriya's case, like the cases above, turns on whether a foreign

official had the authority to engage in an exclusively sovereign act: the decision to retain or waive

the diplomatic immunity of a former Ambassador to the United States.  Because only Sri Lanka

may waive Ambassador Wickramasuriya's immunity, and because the record establishes that the

Sri Lankan official who issued the purported waiver "act[ed] beyond the scope of his authority,"

that "unauthorized act . . . cannot be attributed to the foreign state."  *Id.* at 1089 (quoting *Phaneuf*,

106 F.3d at 308); *see also Velasco*, 370 F.3d at 400 ("Whether a third party reasonably perceives

that the sovereign has empowered its agent to engage in a transaction . . . is irrelevant if the sovereign's constitution or laws proscribe or do not authorize the agent's conduct and the third party fails to make a proper inquiry.").  In light of these facts, the government cannot carry its burden to show that a valid waiver occurred.  *See Knab v. Republic of Georgia*, No. 97-cv-3118, 1998 WL 34067108, at *2 (D.D.C. May 29, 1998).

Although the actual authority analysis resolves the case, the government cannot prevail on an apparent authority theory, either.  *See SACE*, 243 F. Supp. 3d at 24.  In *SACE*, the court held that actual authority was required but, in the alternative, considered and rejected plaintiff's theory of apparent authority.  The court explained: "[E]ven if apparent authority can suffice to trigger the FSIA's waiver provision, any belief that the Paraguayan official at issue here had the authority to waive Paraguay's sovereign immunity was unreasonable, given the fact the official was not a duly-accredited ambassador or otherwise vested with the power to act on Paraguay's behalf in this regard, and was also patently engaged in self-dealing when he made the waiver representations." *Id.*  Here, as in *SACE*, the relevant official lacked both apparent and actual authority to effect a waiver of immunity on behalf of the foreign state.

The potential defects in the purported waiver were evident from the circumstances surrounding it.[4]  The United States requested waiver of Ambassador Wickramasuriya's diplomatic immunity on October 23, 2017, and Mr. Kariyawasam—then the Secretary to the Ministry of Foreign Affairs, a position distinct from the cabinet-level position of Minister—transmitted the

---

[4] Indeed, the purported waiver occurred just weeks after the same Sri Lankan official confirmed in a letter to Ambassador Wickramasuriya's attorney that the Ambassador continued to enjoy diplomatic immunity "with regard to those acts that were performed in the exercise of his functions as a member of the Embassy of Sri Lanka to the United States."  **Fernando Decl. Ex. A**, Letter from Prasad Kariyawasam to Mr. W J Shavindra Fernando (Oct. 6, 2017); *see also* **Fernando Decl. ¶ 6** (noting that the purported waiver was "also signed by Prasad Kariyawasam").

purported waiver *that same day*. *See* **Fernando Decl. Ex. B**; **Fernando Decl. ¶ 6**.[5] This turnaround of mere hours was facially insufficient to permit Sri Lankan officials to fully evaluate the request, follow proper internal protocol to obtain authority for the waiver, and memorialize the waiver in a valid, authorized diplomatic note. The recent diplomatic exchanges between the United States and Sri Lanka reflect a far more typical and realistic cadence. *See* **Fernando Decl. Exs. E-G** (referencing diplomatic notes dated July 3, July 29, August 19, and September 8, 2020). Even if U.S. officials had engaged in informal discussions with Sri Lankan officials regarding waiver of Ambassador Wickramasuriya's immunity before October 23, 2017, the Sri Lankan note dated October 23 states that it is in response to U.S. diplomatic note 756 dated October 23, 2017. **Fernando Decl. Ex. B**.

Whether or not the United States reasonably relied on the Sri Lankan note dated October 23 to bring charges against Ambassador Wickramasuriya, now that Sri Lanka has confirmed that Mr. Kariyawasam "act[ed] beyond the scope of his authority," the government may no longer rely on the purported waiver. *Packsys*, 899 F.3d at 1089 (quoting *Phaneuf*, 106 F.3d at 308). Continued reliance would violate the United States' obligations under the VCDR, since the receiving state has no authority to override the sending state's decision to retain a diplomatic agent's immunity. *See* VCDR art. 32.1 (providing for waiver by the sending state); State Dep't Immunity Guidance at 10 (acknowledging that "sending countries 'own' the[] privileges and immunities" set forth in the VCDR).

The U.S. government extends privileges and immunities to the diplomatic agents of other governments not as a favor but because the United States expects those governments to extend the

---

[5] We requested documents related to the purported immunity waiver via a *Brady* and discovery request dated Wednesday, October 23, 2020. We have received some communications from the government in response to this request, but we do not have a full record.

same privileges and immunities to U.S. diplomats.  *See* State Dep't Immunity Guidance at 5 ("[A] failure of the authorities of the United States to fully respect the immunities of foreign diplomatic and consular personnel may complicate diplomatic relations between the United States and the other country concerned.  It may also lead to harsher treatment of U.S. personnel abroad, since the principle of reciprocity has, from the most ancient times, been integral to diplomatic and consular relations.").   In a reciprocal circumstance, the U.S. government would consider it entirely unacceptable if a foreign government insisted on relying on an apparent waiver of the immunity of a U.S. diplomat by a U.S. government official who acted for political purposes and without actual authority to issue the waiver.

## II.   Ambassador Wickramasuriya Is Entitled to Residual Diplomatic Immunity Because the Indictment Relates to Acts that He Allegedly Performed in the Exercise of His Functions as a Member of the Sri Lankan Mission

It is undisputed that Ambassador Wickramasuriya was serving as Sri Lanka's Ambassador to the United States at the time of the embassy purchase.  Indictment, ECF No. 1, ¶ 1.  Thus, so long as the alleged acts were "performed . . . in the exercise of his functions as a member of the mission," VCDR art. 39.2, the court must dismiss the case under 22 U.S.C. § 254d, *Knab*, 1998 WL 34067108, at *2, 4.  Although the question of residual diplomatic immunity is "rarely discussed by American courts," *Knab*, 1998 WL 34067108, at *4, both the available case law and the text of the VCDR (along with authoritative sources interpreting it) confirm that it bars the government's case here.  In addition, the government's own position from the earliest days of this case demonstrates that the government itself believed that Ambassador Wickramasuriya had acted within the scope of his authority as a diplomat—otherwise, the government would not have sought

a waiver of the Ambassador's residual diplomatic immunity, which covers only acts performed in the exercise of his functions as a member of the mission.

### A. The Available Case Law, Including Authority from this District, Confirms that the Alleged Conduct Falls Within the Scope of Residual Diplomatic Immunity

The available case law supports dismissal on immunity grounds. Because the VCDR's residual immunity provision does not distinguish between immunity from civil suit and immunity from criminal prosecution, both contexts are instructive. *See United States v. Al Sharaf*, 183 F. Supp. 3d 45, 52-53 (D.D.C. 2016) (relying on the leading civil cases, *Swarna v. Al-Awadi*, 622 F.3d 123 (2d Cir. 2010), and *Brzak v. United Nations*, 597 F.3d 107 (2d Cir. 2010), to determine whether defendant was entitled to residual diplomatic immunity from criminal prosecution). In conducting the immunity analysis, the court must proceed "without judging whether the underlying conduct actually occurred, or whether it was wrongful." *Brzak*, 597 F.3d at 113; *accord Al Sharaf*, 183 F. Supp. 3d at 52 (citing *Swarna* and *Brzak*). "If the rule were otherwise, routine allegations of wrongful conduct or improper motive would defeat the immunity" and "'the solid protection' that 'Congress intended to afford' . . . would indeed be evanescent." *Brzak v. United Nations*, 551 F. Supp. 2d 313, 320 (S.D.N.Y. 2008) (quoting *Donald v. Orfila*, 788 F.2d 36, 37 (D.C. Cir. 1986)).

In *Brzak*, the Second Circuit dismissed employment discrimination claims, including claims based on allegations of sexual harassment, as barred by a residual immunity that parallels residual diplomatic immunity under the VCDR. *Brzak*, 597 F.3d at 113. The court explained that such claims "involve personnel management decisions falling within the ambit of the defendants' professional responsibilities." *Id.* Thus, the alleged conduct was "performed . . . in the exercise of [defendants'] functions," regardless of whether it was wrongful or constituted an abuse of their authority in the workplace. *See Brzak*, 551 F. Supp. 2d at 320 ("The allegations of sexual harassment and 'indecent battery' against [the defendant] are allegations of abuse of authority in

19

the workplace. Whether [those] alleged acts were intended or perceived as sexual in nature may be relevant to their wrongfulness, but not to the determination of functional immunity.").

Similarly, in *De Luca v. United Nations Organization*, the court held that former UN officials were shielded by residual immunity from various workplace misconduct claims, including allegations that they issued a fraudulent pay statement, denied plaintiff extended medical coverage, failed to respond to plaintiff's complaints, and retaliated against the plaintiff by creating a fraudulent tax audit. 841 F. Supp. 531, 534 (S.D.N.Y. 1994). Looking to VCDR Article 39.2, the court concluded that defendants were immune from suit because the claims were "based solely on [defendants'] official activities at the U.N." *Id.* The court emphasized that official-functions immunity "can[not] be defeated by allegations of illegal conduct" and that allegations that "defendants acted in bad faith or with improper motive" have "no bearing" on the determination. *Id.* at 535.

By contrast, courts have rejected claims of residual diplomatic immunity only when the alleged conduct is truly "peripheral" or "incidental" to the former diplomat's official functions. In *United States v. Al Sharaf*, for example, the government charged a former Financial Attaché to the Kuwait Health Office in Washington, D.C. with various crimes related to the embezzlement of funds. 183 F. Supp. 3d at 47-48. The government alleged that the defendant: (1) conspired to create shell companies and opened bank accounts in the names of these shell companies; (2) conspired to create fake medical invoices for unperformed medical services on behalf of the shell companies; (3) conspired to pay the fake invoices by wiring funds, or issuing checks, from the Kuwait Health Ministry's bank account into the U.S. bank accounts controlled by the defendant in the names of the shell companies; and, (4) along with co-conspirators, withdrew in cash the funds deposited by the Kuwait Health Ministry into the shell companies' U.S. bank accounts. *Id.* at 48.

The government also alleged that the defendant accepted cash from a co-conspirator at her office in the Kuwait Embassy and directed her co-conspirators, who were her subordinates at the Kuwait Health Office, to edit transaction records associated with the unauthorized payments. *Id.*

> The court looked to *Swarna* and *Brzak* for the core principles of residual immunity:
>
> Residual immunity applies only to actions that are "directly imputable to the state or inextricably tied to a diplomat's professional activities," *Swarna*, 622 F.3d at 135, or actions that "fall within the 'ambit' of the diplomatic agent's 'professional responsibilities,'" *Brzak*, 597 F.3d at 113 (citations omitted). "[A]cts that are 'incidental' to the exercise of his functions as a member of the mission" are not protected. *Swarna*, 622 F.3d at 134.

*Id.* at 52. Applying these principles to the allegations in the indictment, the court determined that the alleged acts "were not an exercise of [Ms. Al Sharaf's] official functions as a member of the mission," and thus residual immunity did not apply. *Id.* at 58.

The court's reasoning is instructive. In denying residual immunity, the court expressly distinguished the facts of Ms. Al Sharaf's case from an alternative scenario that describes the facts of Ambassador Wickramasuriya's. *See id.* at 53 ("The defendant . . . ***is not charged with stealing her employer's funds***, to which she had authorized access by virtue of her position." (emphasis added)); *id.* at 57 ("In other words, ***the defendant is not charged with embezzlement from her employer*** of the medical claims payments. Instead, she is charged with conspiring to launder the ill-gotten funds by creating shell companies, opening bank accounts for the shell companies and withdrawing cash from those bank accounts to conceal the funds' source—precisely those charged acts that are not 'inextricably tied' to her professional responsibilities." (emphasis added)).[6] These

---

[6] In *Al Sharaf*, the sending state had expressly denied that the alleged activities were performed in the course of defendant's official duties—a position Sri Lanka has not taken here. *Id.* at 53 n.7 (explaining Kuwait's position that "the activities set forth in the Attachment to the aforesaid Diplomatic Note [were] . . . not performed in connection with, or in the furtherance of, the duties or official functions of a diplomatic employee").

counterfactuals illuminate the scope of the VCDR's residual immunity provision and, properly applied, would require dismissal here.

*Boanan v. Baja* provides an additional example of conduct that is "entirely peripheral to [the former diplomat's] official duties as a diplomatic agent." 627 F. Supp. 2d 155, 170 (S.D.N.Y. 2009). Plaintiff brought claims of forced labor, human trafficking, and involuntary servitude against a former diplomat, alleging that he had forced her to serve as a domestic worker against her will. *Id.* at 158-59. The diplomat lived inside the mission, and all of the alleged acts occurred entirely within the mission's premises. *Id.* In addition, the diplomat had secured a passport and visa for plaintiff based on her affiliation with diplomatic personnel, and plaintiff sometimes cleaned up after diplomatic parties. *Id.* Nonetheless, the court held that alleged conduct "was a private act for which [defendant] cannot avail himself of residual immunity pursuant to Article 39(2)." *Id.* at 170.

Here, unlike in *Al Sharaf* and *Baja*, the allegations relate solely to acts performed in the exercise of Ambassador Wickramasuriya's diplomatic functions. The embassy transaction was far from a personal project of Ambassador Wickramasuriya's. Sri Lanka, not Ambassador Wickramasuriya, was the purchaser of the property, *see* Indictment, ECF No. 1, ¶¶ 5, 27, 31, and other high-ranking embassy officials handled the transaction for the Sri Lankan government, *id.* ¶ 37 (listing embassy officials who attended the closing). In addition, a professional realtor, closing attorney, and title company represented Sri Lanka in all aspects of the transaction, including the preparation of draft and final HUD-1 forms, the calculation of excess funds, and disbursement of the funds, subject to their professional obligations and applicable laws. *Id.* ¶¶ 8-9, 11-12, 31-32, 37, 41-42, 48, 52. Indeed, if the government ultimately is able to prove the linchpin of the indictment—that Ambassador Wickramasuriya instructed Title Company to

transfer funds to an unauthorized recipient—it would *confirm* that he was acting within the scope of his functions as Ambassador.  Surely these instructions would have carried no weight had he not been acting as the representative of Title Company's client, Sri Lanka.

Synthesizing the key principles from the cases above, it is clear that Ambassador Wickramasuriya is entitled to residual immunity.  *Brzak and De Luca* teach that allegations of unlawful activity are not enough to defeat an immunity claim.  *Baja* helps clarify the characteristics of private, peripheral conduct, which are readily distinguishable from the circumstances here.  And *Al Sharaf* confirms that residual immunity is available for the precise conduct alleged in the indictment: charges that a defendant was "stealing [his] employer's funds, to which [he] had authorized access by virtue of [his] position."  183 F. Supp. 3d at 53.

### B.  All Relevant VCDR Provisions Support Ambassador Wickramasuriya's Position

Because the VCDR is the governing treaty, its text controls the immunity analysis.  The case law above focuses on the VCDR's residual immunity provision, Article 39.2, but other VCDR provisions also support the conclusion that Ambassador Wickramasuriya is entitled to residual diplomatic immunity.

Denza, a leading authority on diplomatic immunity, explains that the determination of "whether the entitled person acted 'in the exercise of his functions as a member of the mission' . . .  should be made in light of Article 3 of the [VCDR]."  Eileen Denza, Diplomatic Law: Commentary on the Vienna Convention on Diplomatic Relations 364 (4th ed. 2016) (hereinafter "Denza").  Article 3 defines the "functions of a diplomatic mission" to include:

(a) Representing the sending State in the receiving State;

(b) Protecting in the receiving State the interests of the sending State and of its nationals, within the limits permitted by international law;

(c) Negotiating with the Government of the receiving State;

(d) Ascertaining by all lawful means conditions and developments in the receiving State, and reporting thereon to the Government of the sending State;

(e) Promoting friendly relations between the sending State and the receiving State, and developing their economic, cultural and scientific relations.

VCDR art. 3.1.

At minimum, the purchase of a new embassy falls within the "representation" function of a diplomatic mission. *See* VCDR art. 3.1(a). Arguably, however—because *all* of the functions in Article 3 depend on the availability of physical premises from which the mission can conduct its business—efforts to secure such premises serve other functions listed in Article 3 as well. The "premises of the mission" are so important that the VCDR expressly defines the term and addresses it repeatedly throughout the Convention. *See* VCDR art. 1(i) (defining the "premises of the mission" as "the buildings or parts of buildings and the land ancillary thereto, irrespective of ownership, used for the purposes of the mission including the residence of the head of the mission"); VCDR art. 21.1 (providing that the receiving state shall facilitate the acquisition of premises on its territory or otherwise assist the sending state in obtaining accommodation); VCDR art. 22.1 ("The premises of the mission shall be inviolable."); VCDR art. 22.2 ("The receiving State is under a special duty to take all appropriate steps to protect the premises of the mission against any intrusion or damage and to prevent any disturbance of the peace of the mission or impairment of its dignity."); VCDR art. 22.3 ("The premises of the mission, their furnishings and other property thereon and the means of transport of the mission shall be immune from search, requisition, attachment or execution."). Article 41.3 recognizes a direct link between the premises of the mission and its functions, providing that "[t]he premises of the mission must not be used in any manner incompatible with the functions of the mission as laid down in the present Convention."

24

Here, all of the alleged conduct relates to Ambassador Wickramasuriya's involvement in the embassy transaction—a transaction that, at minimum, served the mission's function of representing Sri Lanka in the receiving state. *See* VCDR art. 3.1(a). The government alleges that Mr. Wickramasuriya participated in the embassy transaction in his capacity as Ambassador, not as a private actor. *See* Indictment, ECF No. 1, ¶ 28 (alleging that Ambassador Wickramasuriya "decided to purchase the property . . . [that] would act as the new Sri Lankan embassy in Washington, D.C"); *id.* ¶¶ 5, 27, 31 (alleging that the Sri Lankan government, not Ambassador Wickramasuriya, was the purchaser of the property and appropriated funds for the transaction). In other words, this is not a case in which the defendant is accused of using his official position to gain access to opportunities for private wrongdoing. Any wrongdoing occurred in the course of the embassy transaction.

Importantly, Denza emphasizes that "[t]he test is not whether the action was carried out under *instructions* from the sending State." Denza at 364 (emphasis added). Such a test would "be relevant to state immunity and to state responsibility," not to the immunity of the individual diplomat. Denza at 364. In determining an individual diplomat's entitlement to immunity, the court must consider whether the alleged conduct was "performed . . . in the exercise of his functions as a member of the mission"—and it must do so "without judging whether the underlying conduct actually occurred, or whether it was wrongful." *Brzak*, 597 F.3d at 113; *accord Al Sharaf*, 183 F. Supp. 3d at 52 (citing *Swarna* and *Brzak*). Because a sitting Ambassador's participation in his government's purchase of a new embassy serves, at minimum, the mission's function of representation in the receiving state, the alleged acts fall within the scope of residual diplomatic immunity.

### C.  The Government's Own Prior Positions Cast Doubt on Its Immunity Claims

The government's own positions throughout this case confirm that Ambassador Wickramasuriya is entitled to residual diplomatic immunity.  On October 23, 2017, when the government asked Sri Lanka to waive Ambassador Wickramasuriya's immunity, Ambassador Wickramasuriya was *already* a former diplomat.  Thus, the government could have proceeded without a waiver for any investigation or prosecution that related to conduct outside of Ambassador Wickramasuriya's diplomatic functions.

Throughout these proceedings, the government has relied on the illegitimate waiver as the basis for Ambassador Wickramasuriya's prosecution.  More recently, as the foundation for that purported waiver has become increasingly shaky, the government has pivoted to the argument that immunity is unavailable regardless of whether a valid waiver occurred.  But its prior actions are revealing: the government sought a waiver of Ambassador Wickramasuriya's residual diplomatic immunity because it thought it needed to do so in order to bring this case.

**CONCLUSION**

Because Sri Lanka has not waived Ambassador Wickramasuriya's diplomatic immunity, and because the indictment relates to acts that he allegedly performed in the exercise of his functions as Ambassador from Sri Lanka to the United States, Ambassador Wickramasuriya is entitled to residual diplomatic immunity from criminal prosecution.  Accordingly, this Court should dismiss the indictment pursuant to 22 U.S.C. § 254d.

Dated: September 30, 2020                      Respectfully submitted,

/s/ Amy Jeffress
Amy Jeffress (DC Bar No. 449258)
Kaitlin Konkel (DC Bar No. 1021109)
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave. NW
Washington, DC 20001
Telephone: (202) 942-5000
Fax: (202) 942-5999
amy.jeffress@arnoldporter.com
kaitlin.konkel@arnoldporter.com

Danny Onorato (DC Bar No. 480043)
Stuart Sears (DC Bar No. 977144)
Schertler & Onorato LLP
901 New York Avenue NW
Washington, DC 20001
Telephone: (202) 628-4199
Fax: (202) 628-4177
donorato@schertlerlaw.com
ssears@schertlerlaw.com

*Attorneys for Jaliya Chitran Wickramasuriya*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 30, 2020, I caused the foregoing to be electronically

filed using the CM/ECF system, which will notify all counsel of record of the filing.


/s/ Amy Jeffress