**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 18-cr-120 (TSC) |
| | ) | |
| JALIYA CHITRAN WICKRAMASURIYA, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**GOVERNMENT OPPOSITION TO MOTION TO DISMISS THE**
**INDICTMENT ON DIPLOMATIC IMMUNITY GROUNDS**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully opposes the motion filed by the Defendant to dismiss the indictment on diplomatic immunity grounds.  As a former diplomat, the Defendant would only enjoy "residual immunity" from U.S. criminal jurisdiction for acts performed in the exercise of his official functions.  The Defendant does not enjoy residual immunity for his wire fraud, money laundering and his false statements on an immigration application, and it therefore is irrelevant whether or not Sri Lanka waived any immunity he continued to enjoy.  The Defendant's motion should be denied on this basis.  Even if the Court were to reach the question of whether the government of Sri Lanka properly waived any immunity that the Defendant might have enjoyed, there is no basis to conclude that the waiver was invalid.

## I.   THE VIENNA CONVENTION ON DIPLOMATIC RELATIONS AND THE DIPLOMATIC RELATIONS ACT

The Vienna Convention on Diplomatic Relations (VCDR) is an international treaty that sets forth, *inter alia*, the privileges and immunities to be accorded to diplomatic agents and other diplomatic mission staff.  *See* The Vienna Convention on Diplomatic Relations, Apr. 18, 1961, 28 U.S.T. 3227, T.I.A.S. 7502, 500 U.N.T.S. 95.  A "diplomatic agent" is the term used to refer to ambassadors and other diplomatic officers who generally have the function of dealing directly with host country officials.  *See* U.S. Department of State, Office of Foreign Missions, *Diplomatic and Consular Immunity, Guidance for Law Enforcement and Judicial Authorities*, at 7 (2019) (attached hereto as Exhibit 1).  Immunity is intended for the benefit of the sovereign, not the individual officials on whose behalf immunity may be asserted.  *See* VCDR, preamble, cl. 4 ("[T]he purpose of such privileges and immunities is not to benefit individuals but to ensure the efficient performance of the functions of diplomatic missions as representing States.").

Under the VCDR, diplomatic agents accredited to the United States as members of a foreign government's diplomatic mission enjoy complete immunity from the criminal jurisdiction of the receiving state (here, the United States) during the period of their assignment.  *See* VCDR, Art. 31.  This immunity is based upon their status as diplomatic agents and covers both their official and private conduct.  Generally, during that time, diplomatic agents may not be arrested, detained, prosecuted or sued unless their immunity is waived by the sending state.  *See United States v. Khobragade*, 15 F. Supp. 3d 383, 385 (S.D.N.Y. 2014); *See also* State Department Declaration at ¶ 2.

Although sitting diplomatic agents enjoy broad immunity from criminal prosecution pursuant to the VCDR, former diplomats retain immunity only for their prior official acts, often

referred to as "residual immunity." *See* VCDR, Art. 39(2).  Specifically, Article 39(2) of the VCDR states:

> When the functions of a person enjoying privileges and immunities have come to an end, such privileges and immunities shall normally cease at the moment when he leaves the country, or on expiry of a reasonable period in which to do so, but shall subsist until that time, even in case of armed conflict.  *However, with respect to acts performed by such a person in the exercise of his functions as a member of the mission, immunity shall continue to subsist.*

VCDR, Art. 39(2) (emphasis added); *See also* State Department Declaration at ¶ 3-4.  Residual immunity "is a less expansive immunity that remains with former diplomats for certain acts committed during their occupation of the diplomatic station.  Specifically, once a diplomat becomes a 'former' diplomat, he or she is not immune from suit for prior acts unless those acts were performed 'in the exercise of [the former diplomat's] functions as a member of the mission.'" *Swarna v. Al-Awadi*, 622 F.3d 123, 134 (2d Cir. 2010) (quoting VCDR Art. 39(2)); *see also United States v. Al Sharaf*, 183 F. Supp. 3d 45, 50-51 (D.D.C. 2016).  A sovereign can waive the immunities enjoyed by its current and former diplomatic agents, and the VCDR provides that waivers must always be express. VCDR, Art. 32(2).

The VCDR's immunity provisions are given full effect under the Diplomatic Relations Act, 22 U.S.C. § 254d, which provides that:

> Any action or proceeding brought against an individual who is entitled to immunity with respect to such action or proceeding under the [VCDR] . . . or under any other laws extending diplomatic privileges and immunities, shall be dismissed.  Such immunity may be established upon motion or suggestion by or on behalf of the individual, or as otherwise permitted by law or applicable rules of procedure.

22 U.S.C. § 254d.

In evaluating a motion to dismiss pursuant to Section 254d of the Diplomatic Relations Act, the court must determine whether the acts charged in the criminal complaint constitute acts that would be immune from prosecution. *See Khobragade*, 15 F. Supp. 3d at 388.  In so doing,

the court must consider the allegations in the indictment to be true "without judging whether the underlying conduct actually occurred."  *Brzak v. United Nations*, 597 F.3d 107, 113 (2d Cir. 2010); *see also Al Sharaf*, 183 F. Supp. 3d at 52-53 ("To determine whether the charged acts are protected as an exercise of [the defendant's] functions as a member of the mission, the court must not judge, whether the underlying conduct actually occurred, or whether it was wrongful. Rather, our consideration is a functional one, which parallels the objective tests we have adopted in applying other forms of immunity. . . .  [T]he precise task before the Court [is] to scrutinize the charged acts objectively and evaluate whether they fall within the defendant's official functions subject to her residual immunity." (internal citations and quotation marks omitted)).

## II.   FACTUAL BACKGROUND

### A.   The Indictment

The indictment in this case charges Jaliya Chitran Wickramasuriya (Defendant) with five counts consisting of wire fraud, in violation of 18 U.S.C. § 1343; money laundering, in violation of 18 U.S.C. § 1956; and making a false statement in an immigration application, in violation of 18 U.S.C. § 1546.  The Defendant served as Sri Lanka's Ambassador to the United States from July 14, 2008 until May 15, 2014.  The indictment alleges that, from in or around late 2012 to November 2013, the Defendant devised a scheme to defraud the Government of Sri Lanka during the purchase of Sri Lanka's new embassy property and to obtain money by means of materially false and fraudulent pretenses, representations, and promises.  Indictment ¶ 25.  The indictment notes that the purchase price for the new embassy property was $6.25 million, but the Government of Sri Lanka appropriated $6.6 million for the purchase of the property.  *Id.* ¶¶ 30-31.  According to the indictment, on or about January 12, 2013, the Defendant prepared and signed a memorandum instructing relevant parties to disburse the remaining, unaccounted-for

funds ($332,027.35) to two separate third parties, both of which had no role in the real estate transaction. *Id.* ¶¶ 33-35. The Defendant apparently sent these instructions to the relevant parties using a personal, non-Sri Lankan government email account. *Id.* ¶ 36.

The indictment states that the disbursement of the unaccounted-for funds to unrelated third parties was not authorized by the Government of Sri Lanka. *Id.* ¶ 40. Furthermore, according to the indictment, the Defendant provided embassy officials with a document labeled "Addendum to the Settlement Statement," purporting to reflect additional commission payments totaling $332,027.35 to the respective realtors involved in the purchase—commission payments which were never made to the realtors. *Id.* ¶¶ 55-56. Sometime after the embassy purchase was completed, other embassy officials discovered the disbursement of the unaccounted-for funds to third parties, concluded that neither of these third parties had provided legitimate services to the Sri Lankan embassy during the real estate transaction, and contacted both the legitimate parties involved in the transaction and Sri Lankan authorities to report the unexplained transfers. *Id.* ¶¶ 53-60. Further, the indictment alleges that, after his illegal activity was discovered by Sri Lankan government officials, in October 2013, the Defendant orchestrated a scheme whereby he wired the unaccounted-for funds to a realtor, and then subsequently asked the realtor to wire the funds back to the Government of Sri Lanka, covering up the Defendant's embezzlement. *Id.* ¶¶ 61-66. Finally, the indictment states that, on or about March 25, 2014, the Defendant made a false statement, under penalty of perjury, in his immigration application, when he claimed, *inter alia*, that he had never knowingly committed any crime of moral turpitude. *Id.* ¶ 69.[1]

---

[1]      The Defendant suggests that the false statement Count will "rise or fall with the underlying substantive counts." Defendant's MTD at 11. This statement is simply false. Under the Immigration and Nationality Act, not all crimes of moral turpitude necessarily involve a criminal conviction, so long as the "acts" "constitute the essential elements" of a crime of moral turpitude. Thus, whether the Defendant could be prosecuted for embezzling money from the Government of Sri Lanka due to an alleged defense of residual immunity, has no bearing on

B.    The Waiver of the Defendant's Immunity

In September 2017, the Defendant voluntarily agreed to speak to U.S. law enforcement agents about the purchase of the new Sri Lankan embassy.  Following that conversation, investigators learned that the Sri Lankan Ministry of Foreign Affairs issued a letter dated October 6, 2017 to Sri Lankan counsel for the Defendant indicating that the Government of Sri Lanka had not waived any immunities the Defendant continued to enjoy (attached as Exhibit A to the Declaration in support of Defendant's Motion to Dismiss the Indictment on Diplomatic Immunity Grounds and Memorandum of Law in Support ("Def.'s MTD") (dkt. No. 36-2)). [2]  Sri Lankan investigators had previously advised U.S. investigators that it was the opinion of the Sri Lankan investigators that the government of Sri Lanka would waive any immunity the defendant continued to enjoy.  Upon learning of the October 6, 2017 letter, DOJ attorneys discussed the matter with the State Department.  Subsequently, the United States Embassy in Colombo, Sri Lanka advised the State Department that the Sri Lankan government had advised that it was willing to provide a waiver of any immunity the Defendant continued to enjoy.  *See* State Department Declaration at ¶ 8 (attached hereto as Exhibit 2).

---

whether he lied on his I-495 immigration form, when he denied committing a crime of moral turpitude for which he had never been arrested.  *See also United States v. Aquino*, 2008 WL 302363, *3 (N.D. Ohio Feb. 1, 2008) (in naturalization fraud case, knowledge that a person had committed a crime was not dependent upon having been charged or entering a guilty plea).

[2]      The Defendant places significant weight on this letter.  *See* Def.'s MTD at 4.  The letter's indication that the Government of Sri Lanka had not, as of October 6, 2017, waived any immunity that Defendant continued to enjoy does not conflict, however, with the fact that the Government of Sri Lanka later received a formal request from the U.S. government, on October 23, 2017, and thereafter, communicated its decision to waive any such immunity of the Defendant.

On October 20, 2017, the State Department sent a cable to the U.S. Embassy in Colombo,

instructing the Embassy to deliver a diplomatic note to appropriate Sri Lankan officials in order

to request such a waiver.  *See* Cable No. 17 STATE 106114 (attached as Exhibit B to the State

Department's Declaration).  The cable further stated:

> The Sri Lankan Police Financial Crimes Investigations Division arrested former
> Ambassador of Sri Lanka to the United States Jaliya Wickramasuriya on November 16,
> 2016 for misappropriation of funds in the course of the purchase of a building for the Sri
> Lankan embassy in Washington during his tenure there.  He was released on bail on
> March 17, 2017 and subsequently traveled for medical treatment in the United States,
> where he presently remains.  U.S. investigators have questioned Wickramasuriya in
> connection with the alleged misappropriation.  The attached immunity waiver request is
> to facilitate prosecution by the U.S. Attorney's Office in Washington, DC.

*Id.  See also* State Department Declaration at ¶ 9.

On October 23, 2017, the U.S. Embassy in Colombo sent a response cable, indicating that it had

transmitted the referenced diplomatic note to Sri Lanka, via the Sri Lankan Ministry of Foreign

Affairs (Mahishini Colonne, Director General for U.S. and UN Affairs at the Sri Lankan

Ministry of Foreign Affairs).  *See* Cable No. 17 COLOMBO 748 and attached Diplomatic Note

No. 756 (attached as Exhibit C to the State Department's Declaration); *See also* State

Department Declaration at ¶ 10.

On October 24, 2017, the U.S. Embassy in Colombo sent a subsequent cable indicating that it

received a responsive diplomatic note from the Sri Lankan Ministry of Foreign Affairs, agreeing

to waive any immunity enjoyed by the Defendant for purposes of the pending criminal

investigation.[3]  *See* Cable No. 17 COLOMBO 750 and attached Diplomatic Note No. L/PO1/33

(attached as Exhibit D to the State Department's Declaration); *See also* State Department

Declaration at ¶ 11. This exchange of diplomatic notes followed the accepted diplomatic practice for formal state-to-state communications occurring through diplomatic channels.

On July 2, 2020, the Government of Sri Lanka sent a diplomatic note to the United States, in which the Government of Sri Lanka referred to its October 23, 2017 diplomatic note waiving any immunity enjoyed by the Defendant.  *See* Def.'s MTD Ex. E (dkt. no. 36- 6), Diplomatic Note L/POL/33(VII), from Sri Lanka to the United States (July 2, 2020) (also attached as Exhibit E to the State Department's Declaration).  The Government of Sri Lanka further stated that "no records are available in [the Presidential Secretariat and the Ministry of Foreign Affairs] to prove that [the] former President has issued such instructions." *Id.*  The diplomatic note further indicated that the government believed the waiver was not legitimate and that the prior diplomatic note should be withdrawn.  *Id.  See also* State Department Declaration at ¶ 13.

On August 19, 2020, the United States sent a response diplomatic note to Sri Lanka, indicating that the U.S. government viewed Sri Lanka's October 23, 2017 waiver to have been valid.  *See* Def.'s MTD Ex. F (dkt. No. 36-7), Diplomatic Note from the United States to Sri Lanka (August 19, 2020) (also attached as Exhibit F to the State Department's Declaration).  Among other things, the U.S. government noted that international law requires that waivers be express, but it does not dictate the internal domestic process for waiver or provide that a waiver can only be made by a head of state or government.  *Id.* at 1-2.  The U.S. government further indicated that Sri Lanka's October 23, 2017 waiver was express and appropriately communicated by the Sri Lankan Ministry of Foreign Affairs via diplomatic note on behalf of the Government of Sri Lanka.  *Id.* at 2; *See also* State Department Declaration at ¶ 14.

On September 8, 2020, the Government of Sri Lanka sent another diplomatic note reiterating the views expressed in its July 2, 2020 note.  *See* Diplomatic Note from Sri Lanka to

the United States, No. US/ADMIN/INQ 2020 (Sept. 8, 2020) (also attached as Exhibit G to the

State Department's Declaration); *See also* State Department Declaration at ¶ 15.  On October 9,

2020, the United States sent a response diplomatic note reiterating the views expressed in its

prior note of August 19, 2020.   See Diplomatic Note from the United States to Sri Lanka (Oct.

9, 2020) (also attached as Exhibit H to the State Department's Declaration).

## III.  <u>DEFENDANT DOES NOT ENJOY IMMUNITY IN THIS CASE</u>

The Defendant does not enjoy residual immunity for his alleged criminal conduct in this

case, including wire fraud, money laundering, and lying on his immigration application.  He

therefore cannot claim immunity from this criminal proceeding, and whether Sri Lanka's waiver

was given properly or not is ultimately irrelevant.

### A.   <u>Residual Immunity Only Applies to Official Acts</u>

As noted above, Article 39(2) of the VCDR provides that, once a diplomat has left his or

her position, immunity only continues with respect to acts performed by such a person *in the*

*exercise of his functions* as a member of the mission.  As Chief Judge Howell recognized:

> Residual immunity applies only to actions that are directly imputable to the state or
> inextricably tied to a diplomat's professional activities, or actions that fall within the
> ambit of the diplomatic agent's professional responsibilities.  **[A]cts that are incidental
> to the exercise of his functions as a member of the mission are not protected.**

*Al Sharaf*, 183 F. Supp. 3d at 52 (internal citations and quotation marks omitted) (emphasis

added); *see also Swarna v. Al-Awadi*, 607 F. Supp. 2d 509, 517 (S.D.N.Y. 2009), *aff'd in part*,

622 F.3d 123 (2d Cir. 2010) ("[R]esidual diplomatic immunity applies to official acts—because

such acts are attributable to the Sending State—but does not apply to private acts—because the

purpose of immunizing a diplomatic agent's private acts is to ensure the efficient functioning of

a diplomatic mission, not to benefit the private individual, and this purpose terminates when the

individual ceases to be a diplomatic agent.").

Consistent with the text and drafting history of Article 39(2), the State Department has conveyed to federal courts (through the Department of Justice) that the United States, like other countries, interprets the provisions of the VCDR to "limit the application of residual immunity to 'official acts only.'" *See* State Department Declaration at ¶ 4. *See Swarna*, 622 F.3d at 135 (citing Brief for the United States as Amicus Curiae at 11).  Indeed, this is a longstanding view of the U.S. government.  More than thirty years ago, the Legal Adviser of the Department of State explained the practice of the United States with respect to residual diplomatic immunity and affirmed that only "official acts" and "official functions" were protected under Article 39(2).  *See Swarna*, 622 F.3d at 135 (citing Declaration of Abraham D. Sofaer at 3-7 (July 5, 1988), *reprinted in* Br. for the United States as Amicus Curiae).  The Second Circuit has recognized that "[i]t is well settled that the Executive Branch's interpretation of a treaty 'is entitled to great weight.'"  *Id.* (citing *Abbott v. Abbott*,  560 U.S. 1, 15 (2010) (quoting *Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 184–85 n. 10 (1982)).[4]

B.    The Defendant's Alleged Acts Were Not Official Acts

The Defendant's motion mischaracterizes the standard under VCDR Article 39(2).  The Defendant attempts to confuse the standard by reframing it as immunity for any acts that may have been *tangentially related to* other acts he performed in an official capacity.  *See, e.g.*, Def.'s MTD at 1, 22.  This is inaccurate.  Residual immunity applies only with respect to the "official"

---

[4]    Courts routinely defer to the State Department on matters of treaty interpretation and diplomatic immunity. *See, e.g.*, *Paredes v. Vila*, 479 F. Supp. 2d 187, 193 (D.D.C. 2007) (giving "great weight" to agency interpretations concerning treaties within their purview and finding "no reason to disagree" with the State Department's interpretation of Article 31 of the VCDR); *United States v. Guinand*, 688 F. Supp. 774, 775–76 (D.D.C. 1988) ("The Court, though not bound by the State Department's interpretation of the Vienna Convention, finds that it is entitled to great weight and that it is supported by such authorities as have been brought to the attention of the Court."); *see also United States v. Al-Hamdi*, 356 F.3d 564, 570-72 (4th Cir. 2004) (affording "substantial deference" to the State Department's assertion that the defendant lacked immunity because he was over 21 and, accordingly, not entitled to immunity under the VCDR).

acts that the individual performed, not private, criminal acts like the ones alleged in the indictment.  The Defendant's argument that he enjoys residual immunity because the purchase of a new embassy building was performed in the exercise of his functions completely misses the point.  While actions legitimately related to the purchase of a new embassy building would very likely be considered part of the official functions of a diplomat, the fraud and money laundering at issue here cannot be considered part of the Defendant's official diplomatic functions.  *See, e.g.*, *Jimenez v. Aristeguieta*, 311 F.2d 547, 557-58 (5th Cir. 1962) (stating that embezzlement, misappropriation, fraud, breach of trust, and receiving money unlawfully obtained are not acts of a sovereign state but rather are common crimes committed for the defendant's own private financial benefit); *Al Sharaf*, 183 F. Supp. 3d at 57 (noting that the defendant's alleged criminal activity of creating and using shell companies and bank accounts and concealing her embezzlement was not part of her official acts and analogizing to cases interpreting functional immunity under the Vienna Convention on Consular Relations) (citing *Joseph v. Office of Consulate General of Nigeria*, 830 F.2d 1018 (9th Cir. 1987) (permitting plaintiff to bring tort claims alleging vandalism against a consular official because the alleged tortious acts were not performed in the exercise of the defendant's consular functions)).  The Defendant cannot plausibly argue that his alleged commission of wire fraud and money laundering in order to reap personal profit from the Sri Lankan government's purchase of a property—not to mention the Defendant's misrepresentations on his own immigration application—were part of his "official" diplomatic functions performed on behalf of or imputable to the Government of Sri Lanka.

The Defendant's reliance on the purported counterfactual in *United States v. Al Sharaf* is unavailing.  The factual scenario at issue there was in fact similar to the instant case.  There, the government had charged a former Financial Attaché assigned to the Kuwaiti Embassy Health

Office in Washington, D.C. with conspiracy to commit money laundering in connection with the embezzlement of up to two million dollars from the Government of Kuwait. The charged conspiracy included a number of actions, including creating shell companies, creating fake invoices for unperformed medical services on behalf of the shell companies, and conspiring to pay the fake invoices by wiring funds from the Government of Kuwait's Health Ministry bank account into the defendant's own bank accounts. *Al Sharaf*, 183 F. Supp. 3d at 48. Here, too, Defendant Wickramasuriya is alleged to have orchestrated a scheme whereby he created fake documents to hide the fraudulent and unauthorized transfer of unaccounted-for funds from the Government of Sri Lanka to third parties that were unassociated with the transaction, for his own personal benefit. Indeed, the defendant in *Al Sharaf* was alleged to have violated the very same criminal statute at issue here, 18 U.S.C. § 1956 (Defendant Wickramasuriya is also charged with violating additional criminal statutes).

The Defendant's motion points to a purported "alternative scenario" in which Chief Judge Howell noted that the defendant there was not "charged with stealing her employer's funds" or "embezzlement from her employer." Def.'s MTD at 21 (citing *Al Sharaf*, 183 F. Supp. 3d at 53, 57). But Chief Judge Howell did not ultimately suggest that the conclusion would have differed if the defendant had been charged with embezzlement. Rather, she found that the defendant's criminal acts were not subject to residual immunity because they were not part of her official functions or responsibilities. *Al Sharaf*, 183 F. Supp. 3d at 53-54, 56-57. The defendant there argued that the alleged acts were inextricably tied to her official functions because all of the alleged acts were carried out at the diplomatic mission, with other mission employees, and made possible because of the defendant's mission-related functions. *Id.* at 53. Although the defendant argued that the court should not parse the allegations to determine whether any fell outside of the

defendant's official functions, Chief Judge Howell disagreed, stating: "this is the precise task before the Court: to scrutinize the charged acts objectively and evaluate whether they fall within the defendant's official functions subject to her residual immunity." *Id.* After examining the charged acts, Chief Judge Howell concluded that they clearly fell outside the sphere of the defendant's official functions. *See id.* at 53-54 ("the Defendant's official responsibilities regarding the payment of U.S. medical bills of Kuwaiti citizens did not require, and were not furthered in any way, by (1) the incorporation of U.S. shell companies . . . ; (2) the opening of U.S. bank accounts on behalf of those U.S. shell companies; (3) the creation of fictitious bills from those shell companies; and (4) the distribution to her and co-conspirators of funds from the accounts of the shell companies.").

Here, too, the Defendant's official responsibilities regarding the purchase of a new embassy building did not require, and were not furthered in any way by misstating the purchase price of the building and the fraudulent activity to arrange transfer of the excess amounts for his own benefit. Whatever Chief Judge Howell may have intended to suggest by the reference to embezzlement from one's employer, she did <u>not</u> indicate that such alleged actions would, in fact, benefit from residual diplomatic immunity. There is no reason to think that they would. Indeed, in another case in the District Court for the District of Columbia, the court found that a former member of the diplomatic staff of the Embassy of Peru did not enjoy immunity for alleged criminal conduct undertaken while he was still serving at the embassy and that was not part of his official duties. *See United States v. Guinand*, 688 F. Supp. 774, 775-777 (D.D.C. 1988). Like the defendants in *Al Sharaf* and *Guinand*, Defendant Wickramasuriya's alleged acts objectively could not have been related to his official duties.

The Defendant otherwise relies on employment discrimination cases, which are inapposite.  *See* Def.'s MTD at 19-20 (citing *Brzak*, 597 F.3d 107; *DeLuca v. United Nations Org.*, 841 F. Supp. 531, 535 (S.D.N.Y. 1994)).  While one can disagree with the outcomes in those cases, they are clearly distinguishable from the instant case.  In *Brzak*, for example, the plaintiffs alleged that, after one of the plaintiffs complained internally about a former U.N. supervisor inappropriately touching her in a meeting, the defendants retaliated against the plaintiffs by manipulating their work assignments and denying their promotions.  597 F.3d at 110.  The Second Circuit scrutinized the defendants' alleged actions and found that all but one of the allegations "involve personnel management decisions falling within the ambit of the defendants' professional responsibilities" that were "relate[d] to the management of the office."  *Id.* at 113.  The Second Circuit therefore concluded that those claims predicated on "personnel management decisions" were barred by residual immunity.  However, the court declined to opine about whether residual immunity applied to the state law claim of battery, over which the court declined to exercise supplemental jurisdiction after dismissal of the federal claims.  *Id.* at 113-14.  Similarly, in *DeLuca*, the plaintiff sued certain former U.N. officials for, among other things, failing to reimburse withheld taxes and failing to pay the employee's remaining salary and compensatory time upon his departure from the U.N.  *See* 841 F. Supp. at 532-33.  The court held that these acts were all based solely on the former diplomats' official functions and that the claims were barred by residual immunity.  *Id.* at 534.

The holdings in these cases turned on the fact that the allegations involved personnel management decisions falling within the ambit of the defendants' respective professional responsibilities.  In contrast, the criminal allegations in this case do not involve an employment action.  Instead, it is alleged that the Defendant committed criminal acts of wire fraud, money

laundering, and lying on his immigration application, all acts carried out for his own personal profit and benefit, and clearly separate and distinct from his official duties.  Notably, the court in *DeLuca* expressly distinguished the nature of the factual allegations at issue from those in a criminal case involving a U.N. inventory clerk indicted for grand larceny, since the alleged crimes there involved thefts against his co-workers and these thefts were not "directly or remotely related to the functions of his U.N. employment."  841 F. Supp. at 535 (citing *People v. Coumatos*, 224 N.Y.S.2d 504, 510 (N.Y. Sup. Ct. 1961)).

To the extent that there is any question about the scope of a former diplomat's residual immunity, the Court should defer to the State Department's interpretation of the VCDR, and its position that residual immunity under the VCDR is limited to an individual's official acts, as explained in the attached Declaration from the State Department.  *See* State Department Declaration at ¶ 4.  Courts have routinely made clear that the State Department's interpretations of treaties, such as the VCDR, are entitled to "great weight" or "substantial deference."  *See, e.g.*, *Swarna*, 622 F.3d at 135 ("It is well settled that the Executive Branch's interpretation of a treaty 'is entitled to great weight.'" (citing *Abbott*,  560 U.S. at 15); *Paredes*, 479 F. Supp. 2d at 193 (giving "great weight" to agency interpretations concerning treaties within their purview and finding "no reason to disagree" with the State Department's interpretation of Article 31 of the VCDR); *Guinand*, 688 F. Supp. at 775–76 ("The Court, though not bound by the State Department's interpretation of the Vienna Convention, finds that it is entitled to great weight and that it is supported by such authorities as have been brought to the attention of the Court.").  As the Supreme Court confirmed in *Abbott*, a case involving interpretation of a treaty on child abduction, "[t]he Executive, when dealing with delicate foreign relations matters . . . , possesses a great store of information on practical realities such as the reactions from treaty partners to a

particular treaty interpretation and the impact that interpretation may have" on the State Department's conduct of foreign relations. *Abbott*, 560 U.S. at 15. Here, at a minimum, the district court should afford great weight to the State Department's interpretation of the VCDR and diplomatic communications regarding immunity.

The Defendant argues that the allegations in the indictment relate solely to acts performed in the exercise of his diplomatic functions because, he claims, "the embassy transaction was far from a *personal project* of [Defendant's]." Def.'s MTD at 22 (emphasis added). This assertion strains credulity. The embassy transaction may not have been a personal project of the Defendant's, but his criminal conduct in fraudulently misstating the price of the transaction, devising a scheme to transfer unaccounted-for funds to unrelated third parties, and engaging in money laundering in order to hide this fraud could only be described as personally-motivated acts. Indeed, the allegations in the indictment relate to paradigmatically personal acts.[5]

## IV.     THE PURPORTED INVALIDITY OF THE WAIVER OF IMMUNITY

In light of the fact that the Defendant cannot claim residual immunity under the provisions of the VCDR for the acts alleged in the indictment, the Court does not need to reach the

---

[5]     Defendant further asserts that *if* the United States can prove that he ordered the Title Company to transfer funds to an unauthorized recipient, this would *confirm* that he was acting within the scope of his functions as Ambassador because "these instructions would have carried no weight had he not been acting as the representative of Title Company's client, Sri Lanka." Def.'s MTD at 23. Defendant is essentially accused of misusing his position and title as Ambassador to engage in the criminal conduct alleged. Proving that he ordered such unauthorized transfers doesn't prove he was acting within the scope of his functions as Ambassador, but rather it simply proves he is responsible for a crime. As another court stated in the analogous context of consular immunity, "an act in furtherance of a conspiracy by a consular officer which takes advantage of the privileges of that position does not suddenly make it a consular function." *United States v. Cole*, 717 F. Supp. 309, 322-23 (E.D. Pa. 1989).

Defendant's argument regarding the waiver of immunity.  However, given the importance the Defendant places on that waiver, the government submits the following.

A.     The State Department Has Found No Reason to Doubt the Validity of the Waiver

As provided in the attached Declaration, the State Department has found no reason to doubt the validity of the waiver provided by the Government of Sri Lanka on October 23, 2017, which occurred in the context of ongoing discussions between U.S. and Sri Lankan authorities about the matter and was memorialized in an exchange of notes that followed standard diplomatic practice under the VCDR.  The entire basis of the Defendant's argument that the waiver was invalid is that the Government of Sri Lanka has not located records that indicate that the former President of Sri Lanka authorized the waiver.  *See* Def.'s MTD at 6; *see also* letter attached as Exhibit D to the Declaration in support of Def.'s MTD (dkt. no. 36-5) (noting, in response to the Defendant's request for information, that the records in possession of the Presidential Secretariat do not include an instruction from the President); Def.'s MTD Ex. E (dkt. no. 36-6), Diplomatic Note No. L/POL/33(VII) (stating that "the Presidential Secretariat and Ministry of Foreign Relations has been able to verify that no records are available in both offices to prove that former President has issued such instructions").  Defendant states that under Sri Lankan law, the President must order waiver of an Ambassador's diplomatic immunity, since Ambassadors are appointed under the powers of the President in Article 33(2)(d) of the Sri Lankan Constitution.  Def.'s MTD. at 6.  Defendant offers no support, however, for drawing the conclusion that only the President can order a waiver of immunity.  By comparison, the President of the United States has the power to appoint Ambassadors, but waivers of immunity do not have to be ordered by the President.  In any event, the Defendant does not offer any evidence, other

than an apparent internal investigation, that the President of Sri Lanka did not authorize the waiver in the instant case.[6]

Neither the Defendant nor the Government of Sri Lanka provides any further explanation to support the conclusion that the waiver was illegitimate; they do not allege misconduct or provide any other reason to question the validity of the waiver.  Finally, the Defendant provides no explanation for why it took nearly three years for the Government of Sri Lanka to discover that the waiver note was purportedly invalid, a question which is undermined by the fact that the Defendant had instituted legal proceedings in Sri Lanka against both the Sri Lankan Attorney General's Office and the Sri Lankan Ministry of Foreign Affairs in December 2017 to challenge the waiver.

With respect to the Defendant's challenge of the immunity waiver in the Sri Lankan courts, while the United States does not have the Defendant's pleadings from the litigation in Sri Lanka or those of the Sri Lankan Government in opposition thereto, the United States does have the decision issued by the Court of Appeal of the Democratic Socialist Republic of Sri Lanka. *See* March 29, 2019 Opinion (attached hereto as Exhibit 3).  That decision makes clear that the Defendant petitioned the Court of Appeals "to quash the decision" of the Sri Lankan Ministry of Foreign Affairs that waived his immunity and for "a mandate in the nature of a Writ of Mandamus to compel the [Minister of Foreign Affairs and the Secretary of the Ministry of Foreign Affairs] to write to the Government of the United States of America, informing them that [Defendant] continues to enjoy all the diplomatic privileges and immunities" he had with

---

[6]     In fact, as discussed below, representations made to the Sri Lanka Court of Appeals indicate that the President of Sri Lanka did in fact authorize the waiver of the Defendant's immunity for the charged crimes.

respect to "acts performed by him in exercise of his functions as the Ambassador" to the United States.  *Id.* at 3-4.

The Court of Appeals decision recognizes that the "[t]he wordings in the 1st and 3rd paragraphs [of the immunity waiver] also show clearly that this is a communication provided on behalf of the Democratic Socialist Republic of Sri Lanka."  *Id*. at 6.  That decision also recognized that Prasad Kariyawasam, the Secretary of the Ministry of Foreign Affairs had filed an affidavit with the Court in which he indicated that "he had taken steps to inform the embassy of the United States of America by way of *Note Verbal* dated 2017-10-23 that the immunity conferred on the Petitioner was waived pursuant to instructions he had received from His Excellency the President of the Democratic Socialist Republic of Sri Lanka."  *Id*.

The Defendant argued to the Court of Appeals that the decision to waive immunity was "not a decision made by H. E. the President."  *Id*. at 7.  The Court of Appeals, after citing to certain provisions of the Constitution of Sri Lanka and the affidavit filed by the Secretary of the Ministry of Foreign Affairs, concluded that "the Court is satisfied that [the waiver of immunity] is a decision taken by His Excellency the President that the [Defendant] in a circuitous way is challenging in this application."  *Id*. at 7-8.  The Defendant's application was thus dismissed. *Id*. at 8.[7]

B.  Defendant's Arguments Regarding the Purported Invalidity of the Waiver of Immunity are Inapposite

The Defendant argues that Sri Lanka's waiver was not given with proper authority, analogizing exclusively to cases interpreting the Foreign Sovereign Immunities Act (FSIA).  *See*

_____

[7]    The Defendant has filed a writ of certiorari with the Supreme Court of Sri Lanka.  The United States is not in possession of the Defendant's pleadings before that Court or of the Sri Lankan Government's responsive pleadings.  To the knowledge of the United States, the Sri Lankan Supreme Court has not yet ruled on the Defendant's petition.

Def.'s MTD at 13-16.  However, in addition to analyzing a different legal regime, these cases all focus on the question of whether an "agent" of a sovereign state had authority to waive sovereign immunity.  This context is not analogous to waivers of diplomatic immunity under the VCDR.

As noted above, a waiver of a diplomat's immunity under the VCDR must be express. The established practice of states in providing such waivers under the VCDR is through diplomatic correspondence.  As the court confirmed in *United States v. Deaver*, 1987 WL 13365 (D.D.C. June 22, 1987), "[a]ccording to the Legal Adviser, waivers of diplomatic immunity, by universal custom, are requested and granted exclusively through an exchange of diplomatic notes between foreign offices."  Id. at *1.  The question in *Deaver* was whether a diplomatic communication by the Canadian government had been an express waiver of immunity, as required by Article 32 of the VCDR.  *Id.* at *2.  There was no question as to the authority for the diplomatic communication; the Government of Canada was recognized as being the sending authority for diplomatic communications.  *Id.* at *1-2.  Furthermore, U.S. courts have repeatedly confirmed that diplomatic notes serve as the requested form of evidence for a waiver of immunity by the sending government.  *See id.*; *see also In re Doe*, 860 F.2d 40, 43, 45-46 (2d Cir. 1988) (relying on diplomatic note from the Government of the Philippines waiving immunity of former President of the Philippines and his wife in rejecting a claim of head-of-state immunity); *Al Sharaf*, 183 F. Supp. 3d at 54 n.7 (recounting the exchange of diplomatic notes between the State Department and Kuwait to certify there was no claim of immunity for a former diplomat's activities); *Van Den Borre v. State*, 596 So. 2d 687, 690 (Fla. Dist. Ct. App. 1992) (accepting a "Xerox copy" of a diplomatic note as evidence of waiver by the relevant government of its diplomat's immunity).

In this case, there was an exchange of diplomatic notes between the United States and the Sri Lankan Ministry of Foreign Affairs, consistent with the customary diplomatic practice of states for communicating waivers of immunity. The Defendant does not contest that the United States requested a waiver of immunity by diplomatic note dated October 23, 2017. *See* Def.'s MTD at 4. In response, the United States government received a diplomatic note from the Sri Lankan Ministry of Foreign Affairs expressly waiving any immunity that the Defendant continued to enjoy. *See* Def.'s MTD Ex. B (dkt. No. 36-3), Diplomatic Note L/POL/33, from Sri Lanka to the United States (October 23, 2017) (also attached as Exhibit C to the State Department's Declaration). [8] As the Defendant recognizes, Sri Lanka's diplomatic note made clear that it was "in response to U.S. diplomatic note 756." *See id.*; *see also* Def.'s MTD at 17. [9]

---

[8]     Defendant alleges that a Sri Lankan official transmitted the waiver note "to unknown sources in the U.S. government," noting that defense counsel received a copy from the AUSA assigned to the case at the time. *See* Def.'s MTD at 4. However, undersigned government counsel has produced records to defense counsel that demonstrate that the waiver note was provided to the U.S. government through normal diplomatic channels.

[9]     The Defendant alleges that the waiver note is signed by Mr. Kariyawasam, "although the signature is not legible." Def.'s MTD at 5. The Defendant provides no explanation for how he determined that the illegible signature belongs to Mr. Kariyawasam. Even assuming the diplomatic note bears Mr. Kariyawasam's signature, it would not be unusual for a diplomatic note to be signed by a lower-level official. Indeed, diplomatic notes often bear no signature and are simply initialed. *See generally* 5 FAH-1 H610 (Department of State Foreign Affairs Handbook regarding the format of diplomatic notes) (publicly available at: https://fam.state.gov/FAM/05FAH01/05FAH010610.html) (attached as Exhibit A to the State Department's Declaration). Mr. Kariyawasam was a regular interlocutor between Sri Lanka's Ministry of Foreign Affairs and the U.S government at the time. Therefore, to the extent his

In a subsequent diplomatic note, the validity of which is not in question, Sri Lanka referred to its October 23, 2017 note as "Ministry's Note Verbale No. L/POL/33," "issued by the Ministry of Foreign Relations," in order to ask that the note be "withdrawn" on the basis of subsequent internal determinations.  Def.'s MTD Ex. E (dkt. no. 36- 6), Diplomatic Note L/POL/33(VII), from Sri Lanka to the United States (July 2, 2020) (also attached as Exhibit E to the State Department's Declaration).

None of the cases cited by the Defendant involve a waiver of diplomatic immunity by diplomatic note.  Rather, the cases relied upon by the Defendant arise in the sovereign immunity context and involve the actions of an individual purporting to waive a foreign state's immunity in connection with commercial transactions, where the question was whether the individual was in fact acting as an agent on behalf of the foreign state.  *See, e.g.*, *SACE S.p.A. v. Republic of Paraguay*, 243 F. Supp. 3d 21, 27 (D.D.C. 2017) (determining agent status of Paraguayan official who "wore several different hats," including an ambiguous "consul" title, during the negotiations for a construction project); *Packsys, S.A. de C.V. v. Exportadora de Sal, S.A. de C.V.*, 899 F.3d 1081, 1085-86 (9th Cir. 2018) (analyzing whether the Director-General of a company was authorized to waive immunity on behalf of the Mexican government); *Phaneuf v. Republic of Indonesia*, 106 F.3d 302, 307 (9th Cir. 1997) (discussing the standard required to determine whether an ambassador and/or members of a defense security council were authorized to issue ultimately worthless promissory notes on behalf of the government).

Waivers of diplomatic immunity and sovereign immunity are governed by separate doctrines and principles of interpretation.  In U.S. courts, questions of foreign sovereign

---

signature is reflected on Sri Lanka's waiver note, this supports the fact that the waiver process was in accordance with normal diplomatic practice.

immunity are governed by the FSIA, a statute passed by Congress, and waivers of immunity may

be express or implied and can be communicated in a wide variety of ways.  By contrast,

diplomatic immunity is governed by treaty (the VCDR), all waivers must be express, and the

longstanding practice of states is to communicate them through diplomatic correspondence.

Courts have repeatedly refused to reason by analogy between the FSIA and the VCDR.  *See, e.g.*,

*Tabion v. Mufti*, 73 F.3d 535, 539 n.7 (4th Cir. 1996) ("Despite Tabion's suggestion to the

contrary, we decline to use the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. § 1602 *et

seq.*, as an interpretive guide for the Vienna Convention.  The FSIA is a statute which establishes

the framework for determining when federal or state courts in the United States may exercise

jurisdiction over foreign states; it is not a treaty between countries.  In addition, the FSIA was

enacted *after* the Vienna Convention on Diplomatic Relations came into existence, and thus

could not have been a textual source for Convention delegates.  Furthermore, Congress did not

intend for the FSIA to affect diplomatic immunity under the Vienna Convention.") (emphasis in

original); *see also Sabbithi*, 605 F. Supp. 2d at 128 n.3 ("[T]he Court will not consider as

determinative cases interpreting the FSIA."); *Logan v. Dupuis*, 990 F. Supp. 26, 30 (D.D.C.

1997) (rejecting the argument that the FSIA's "commercial activity" exception serves as an

analogy for Article 31 of the VCDR); *Tifa Ltd. v. Republic of Ghana*, 692 F. Supp. 393, 399

(D.N.J. 1988) ("[T]he FSIA governs only the immunity of foreign states and not the immunity of

diplomatic or consular representatives of a foreign state.").

    In cases in which an individual foreign government official purports to waive sovereign

immunity on behalf of a foreign state, courts must determine whether the individual was in fact

acting in an official capacity on behalf of the foreign state for purposes of the alleged waiver.

There is no occasion for such a factual inquiry to be undertaken when a foreign government

sends a diplomatic note expressly waiving the immunity of one of its diplomats in response to a diplomatic note from the receiving state.  Consistent with the longstanding practice of states interpreting the VCDR, this is how waivers of immunity are communicated.  Diplomatic communications are used for correspondence between governments on matters of diplomatic immunity, as well as other official matters pertaining to diplomatic missions.  When such communications are received, there generally would be no basis, and thus there is no practice between foreign ministries, of securing additional documentation to establish that such a note was properly authorized under the other state's internal regulations for approving such waivers. In this case, the Department of State had no concerns about Sri Lanka's waiver of diplomatic immunity, which was communicated properly through diplomatic channels in a manner that comports with the State Department's longstanding understanding of and practice under the VCDR.  The State Department has found no reason to question its determination that the waiver was validly given. *See* State Department Declaration at ¶ 16. Under these circumstances, and given the deference that is owed to the State Department on matters related to the interpretation of the VCDR and diplomatic practice, the waiver should be treated as valid by the court.  The court should not instead conduct its own inquiry into whether Sri Lanka's internal procedures were followed, as the Defendant proposes, and we are aware of no cases in which a U.S. court has adopted such an approach.

C.  The District Court Should Defer to the State Department's Interpretation of the Waiver

The Court should defer to the State Department's determination, since waivers of diplomatic immunity are made through diplomatic channels and the Constitution assigns to the Executive Branch the authority for conducting the nation's diplomacy (and therefore, for determining the validity of diplomatic communications).  Courts "have generally exercised great restraint in

dealing with matters involving our relations with foreign nations, deferring instead to the Executive Branch." *United States v. Williams*, 617 F.2d 1063, 1092 n.9 (5th Cir. 1980) (*en banc*) (citations omitted); *see also United States v. Fernandez-Pertierra*, 523 F. Supp. 1135, 1141–42 (S.D. Fla. 1981) (A "long judicial tradition" supports a "general judicial policy of deference to the executive in the area of foreign relations.") (citing *Dames & Moore v. Regan*, 453 U.S. 654 (1981), and *Haig v. Agee*, 453 U.S. 280 (1981)); Curtis A. Bradley, *Chevron Deference and Foreign Affairs*, 86 VA. L. REV. 649, 659 (2000) ("Since early in the nation's history, courts have been reluctant to contradict the executive branch in its conduct of foreign relations."). Such deference arises out of the "generally accepted view" that "foreign policy [is] the province and responsibility of the Executive," *Dep't of Navy v. Egan*, 484 U.S. 518, 529 (1988) (quoting *Haig*, 453 U.S. at 293-94), authority that derives from Article II of the U.S. Constitution.[10]

---

[10]    *See, e.g.*, *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003) ("[T]he historical gloss on the 'executive Power' vested in Article II of the Constitution has recognized the President's 'vast share of responsibility for the conduct of our foreign relations.'") (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610–11 (1952) (Frankfurter, J., concurring)); *Made in the USA Found.*, 242 F.3d at 1313 ("The Supreme Court has repeatedly recognized that the President is the nation's 'guiding organ in the conduct of our foreign affairs,' in whom the Constitution vests 'vast powers in relation to the outside world.'") (citation omitted). In particular, Article II, section 2, which gives the President the power to "make Treaties" with the advice and consent of the Senate, and Article II, section 3, which grants the President authority to "receive Ambassadors and other public Ministers"— together with the requirement in Article II, section 3, that the President "shall take Care that the Laws be faithfully executed"—provide "explicit textual manifestations of the inherent presidential power to administer . . . the foreign policy of the United States." *Tachiona v. United States*, 386 F.3d 205, 212–13 (2d Cir. 2004) (quoting LAWRENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW § 4-3 (3d ed. 2000)); *see also Made in the USA Found.*, 242 F.3d at 1313 ("The breadth of the President's inherent powers in foreign affairs arises from his role as Chief Executive, and as Commander in Chief. In addition to his power to 'make Treaties' with the advice and consent of two-thirds of the Senators present, the President's authority in foreign affairs is further bolstered by his power to 'appoint Ambassadors . . . and Consuls,' and 'to receive Ambassadors and other public Ministers.'") (citations omitted).

D. <u>Defendant's Reliance on Other Provisions of the VCDR is Likewise Inapposite</u>

Finally, it bears noting that the Defendant's other arguments about the VCDR are likewise misplaced. The Defendant asserts that Sri Lanka has "confirmed that [Defendant's] immunity remains in effect" and that "the United States has no authority to override a sending state's decision to retain diplomatic immunity under the VCDR." Def.'s MTD at 12; *see also id.* at 17 (stating that continued reliance by the United States government on the waiver note "would violate the United States' obligations under the VCDR, since the receiving state has no authority to override the sending state's decision to retain a diplomatic agent's immunity"). The Defendant provides no citation for this principle, and none exists. The VCDR does not provide that a state can "retain" a diplomat's immunity, especially once that diplomat's functions have terminated. Nor does the VCDR provide that the receiving state has "no authority" to "override" such a decision.

The Defendant also confusingly asserts that, at most, the United States may declare a sitting diplomat *persona non grata* and expel the person from the country. This is completely beside the point, as this only applies to sitting diplomats, which the Defendant is not.

Finally, the Defendant's reliance on Article 3 of the VCDR, which sets forth the functions of the mission, is also misplaced. *See* Def.'s MTD at 23-24. While the functions of the mission may include purchasing mission premises, they could not include the Defendant's alleged crimes of money laundering and wire fraud in this case. What's more, the Defendant fails to acknowledge that other provisions of the VCDR provide that diplomats have a duty to respect local law. *See* VCDR, art. 41(1) ("[I]t is the duty of all persons enjoying . . . privileges and immunities to respect the laws and regulations of the receiving state.").

E. <u>Defendant's Arguments Regarding the U.S. Government's Actions in Seeking Waiver are Meritless</u>

The Defendant argues that the U.S. government's actions in seeking the waiver suggests that it only sought the waiver because it was convinced that the Defendant possessed residual immunity. That suggestion is simply false. It has consistently been the position of the United States that the Defendant's efforts to line his own pockets with the money of the government of Sri Lanka fell outside the scope of his official conduct. This conclusion was strengthened by Chief Judge Howell's decision in *Al Sharaf* when she concluded that an individual who engaged in acts similar to the Defendant's was not entitled to residual immunity. As discussed above, the United States was shocked to learn of the October 6, 2017 letter to the Defendant's Sri Lankan counsel indicating that that the Defendant's immunity had not been waived because this was the exact opposite of what the U.S. investigative team had previously been advised by Sri Lankan law enforcement. In response, DOJ attorneys asked the State Department to have the U.S. Embassy in Sri Lanka pose the question to Sri Lanka's Ministry of Foreign Affairs. Upon learning that it was the intention of the Ministry of Foreign Affairs to waive any immunity the Defendant continued to enjoy, a formal request through official diplomatic channels was sent. In response, the Sri Lankan government sent a formal diplomatic note waiving any immunity that the Defendant continued to enjoy, consistent with standard diplomatic practice.

V.     **CONCLUSION**

The VCDR controls the analysis of the issues before the Court and under that treaty and the Diplomatic Relations Act, 22 U.S.C. § 254d, the Defendant does not enjoy residual immunity for his efforts to acquire $332,000 for himself when he was purchasing the property for the new embassy for Sri Lanka.  His conduct was not an official act for which residual immunity would be available.  Finally, the Sri Lankan government's waiver of the Defendant's immunity was properly communicated to the State Department, through standard diplomatic channels, and there is no reason to suspect that it is invalid or ineffective.  Accordingly, the Defendant's motion to dismiss the indictment should be denied.

October 30, 2020                                  Respectfully Submitted,


                                                 MICHAEL R. SHERWIN
                                                 ACTING UNITED STATES ATTORNEY

                                                 /s/  *Arvind K. Lal*
                                                 Arvind K. Lal, D.C Bar No. 389496
                                                 Assistant United States Attorney
                                                 Steven Brantley
                                                 Special Assistant United States Attorney
                                                 555 Fourth Street, N.W.
                                                 Washington, D.C. 20530
                                                 (202) 252-7688 (Lal)
                                                 Arvind.lal@usdoj.gov

                                                 BRIAN C. RABBITT
                                                 Acting Assistant Attorney General

                                 By:      /s/   *Mona Sahaf*
                                                 Mona N. Sahaf
                                                 Trial Attorney
                                                 U.S. Department of Justice
                                                 Criminal Division, HRSP