**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | **Case No: 1:18-cr-00120** |
| **v.** | ) | |
| | ) | **The Hon. Tanya S. Chutkan** |
| **JALIYA CHITRAN WICKRAMASURIYA,** | ) | |
| | ) | **Sentencing Date: July 20, 2022** |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

Mr. Wickramasuriya has had a long and distinguished career as a businessman and public servant. As the former Ambassador to the United States from Sri Lanka, he served admirably and was widely admired for his dedication to the interests of Sri Lankan citizens living in the United States. Indeed, as the letters submitted for the Court's consideration illustrate, Mr. Wickramasuriya is a kind-hearted man, who often spent his own funds to help those in need. Whether it was providing financial assistance to citizens while he was Ambassador or paying for cancer treatment for an employee's spouse, Mr. Wickramasuriya did these things for entirely selfless reasons.

At the age of 62, this matter represents his first and only contact with the criminal justice system. He has led an otherwise law-abiding and remarkable life. Mr. Wickramasuriya submits that a probationary sentence adequately reflects the seriousness of his conduct and appropriately accounts for (1) his acceptance of responsibility, (2) his full and complete satisfaction of restitution in this matter prior to indictment, (3) his scrupulous compliance with the lengthy period of pretrial supervision, (4) immigration and other collateral consequences he may face as a result of his

conduct, and (5) conduct that is not reflective of Mr. Wickramasuriya's life and character described best by those who truly know him.

As provided in the Presentence Investigation Report ("PSR"), Mr. Wickramasuriya has no prior criminal history. He is a loyal and devoted husband and father. He repaid the funds at issue to the Government of Sri Lanka in their entirety nearly nine years ago. He has also accepted complete responsibility for his actions and has saved the government significant time and effort from having to try this complex case. The overwhelming evidence shows that Mr. Wickramasuriya, but for the instant criminal conduct, has exceptionally strong character. Those who know him best attest to his kind heart and unfettering dedication to the Sri Lankan community. He will never appear before this or any Court again.

For these and other reasons set forth below, Mr. Wickramasuriya respectfully asks this Court to fashion a sentence that will adequately account for the serious nature of his crimes but that also recognizes that this conduct was not characteristic of his long record of law abiding public service, as well as the impact any period of incarceration would have on his family, both financially and emotionally. For the reasons set forth herein, we submit that a sentence of 24 months of probation is sufficient, but not greater than necessary, to achieve the purposes of federal sentencing in this case.

## I.   <u>The Advisory Sentencing Guidelines Range</u>

Mr. Wickramasuriya pled guilty to a criminal Information charging him with Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. § 371. The maximum sentence for this offense is 5 years of imprisonment, a fine of $250,000 or twice the pecuniary gain or loss of the offense, pursuant to 18 U.S.C. § 3571(b), and three years of supervised release.

Under the terms of the plea agreement (Dkt. 60), Mr. Wickramasuriya and the government have agreed to recommend certain United States Sentencing Guidelines ("USSG." or "Guidelines") provisions that apply to his offense conduct. *See id*. at 2. The parties agreed that the base offense level is six, USSG §2B1.1(a)(2), but because the offense involved misrepresentation that the defendant was acting on behalf of a government agency, the adjusted offense level is 10 pursuant to USSG §2B1.1(b)(9). The government recommends a two-level reduction for acceptance of responsibility, and therefore the estimated offense level is eight. Because Mr. Wickramasuriya has no prior criminal history, the advisory Sentencing Guidelines range, as is reflected in the Plea Agreement, is zero (0) months to six (6) months. Both parties agreed that because the funds in question were reimbursed to the victim, there is no loss and restitution is not necessary in this case.

The PSR calculates a total offense level of 17, in criminal history category I, and therefore finds that the guideline imprisonment range is 24 months to 30 months. The PSR computation differs from the plea agreement in that the probation officer did not apply note USSG §2B1.1, comment n.3(E)(i) and reduce the loss amount by the money returned by the defendant or other persons acting jointly with the defendant, to the victim. The probation office did note that the "loss table may over-inflate the seriousness of the offense, especially considering that the defendant returned the entirety of the excess funds from the real estate transaction." PSR at page 21, paragraph 146.

In addition, the PSR notes that because he is not a citizen of the United States, Mr. Wickramasuriya's guilty plea and conviction may subject him to deportation and other adverse immigration consequences. As such, the Court can consider departing from the applicable guideline range. *United States v. Smith*, 27 F.3d 649 (D.C. Cir. 1994).

For the many reasons discussed below, Mr. Wickramasuriya urges the Court to accept the parties' agreed to guidelines range and to find that a probationary sentence is "sufficient, but not greater than necessary" to serve all the purposes of federal sentencing.  *See* 18 U.S.C. § 3553(a).

**II.     The Section § 3553 Factors**

Section 3553 requires a sentencing court to impose a sentence that is "sufficient, but not greater than necessary" to comply with four purposes of federal sentencing.  18 U.S.C. § 3553(a). Those four purposes are the need for the sentence imposed (1) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment; (2) to afford adequate deterrence to criminal conduct; (3) to protect the public from further crimes of the defendant; and (4) to provide the defendant with needed training, medical care, or other correctional treatment in the most effective manner.  18 U.S.C. § 3553(a)(2).  In addition, § 3553 requires district courts to consider the following factors in imposing sentence: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the kinds of sentences available; (3) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (4) the need to provide restitution to any victim(s). 18 U.S.C. § 3553(a)(1)-(7).  For the reasons that follow, Mr. Wickramasuriya submits that a probationary sentence comports fully with the sentencing objectives and principles set forth in § 3553.

A.      *The History and Characteristics of Mr. Wickramasuriya*

Born in Sri Lanka, Jaliya Wickramasuriya is the middle son of a Sri Lankan father who worked tirelessly in the garments business and a Sri Lankan mother who was a Buddhist monk and teacher.  Mr. Wickramasuriya grew up in a middle-class neighborhood in Sri Lanka surrounded by family.

After graduating from college, Mr. Wickramasuriya entered the business world and helped form a tea export business, which he still runs today. Mr. Wickramasuriya's company, Ceylon Royal Teas (PVT) LTD, is engaged in 100% tea exports. "Jaliya understood, Sri Lanka, as the premium producer of Ceylon Tea. However, it still exported raw bulk tea to the Middle east and Russia. He wanted to go for value added tea productions. He exploded [sic] the world and searched for the available technologies. He participated in several dozens of international exhibitions. Later he was able to observe the changes in the European and North American markets." (Letter from Sanjeewa Weerawickrama).  Mr. Wickramasuriya is passionate about his business. As his son-in-law describes, "I've watched him regularly take early morning and late night phone calls/meeting, as necessitated by international business hours. Nonetheless, his eyes light up anytime I ask a question about something related to the company. He can walk me through the meticulous preparation and packing of the teabags all the way to nuances of the supply-chain to ship his products." (Letter from Raj Patel)

In 1990, he married his wife, Priyanga, and subsequently had two children. Mr. Wickramasuriya lived in Homogama, Sri Lanka from birth until 2001. He then relocated to Minneapolis, Minnesota for one year for work, and then moved to Atlanta, Georgia in 2002.  His wife and children became naturalized United States Citizens.  Mr. Wickramasuriya did not become a U.S. Citizen so he could work on behalf of the Sri Lankan government.   He is currently a green card holder.

In 2007, Mr. Wickramasuriya moved to Los Angeles, California to work for the Sri Lankan consulate and remained there until July 2008.   Given his extraordinary services, he was appointed Ambassador to the United States and relocated to the Sri Lankan embassy in Washington, DC.  He remained there until his term expired in 2014.

Mr. Wickramasuriya is dedicated to his family and is a fervent ally of the Sri Lankan community.  The letters submitted on his behalf attest to Mr. Wickramasuriya's devotion to his family and to his community.  The letters contain countless anecdotes of individuals who have been touched by Mr. Wickramasuriya's kindness and his dedication to his family and Sri Lankan community alike.  *See* Letters Attached as Exhibit A.

Those who know Mr. Wickramasuriya describe him as a deeply caring and selfless individual.  Roham Dealwis writes, "I have observed him to be honest, kind, a person of integrity, and he possess high moral values and principles. Jaliya is an extremely obliging person, ever willing to help someone in need, both on a personal level as well as his official capacities." (Letter from Roham Dealwis).

Ranil Liyanage, who has known Mr. Wickramasuriya for over three decades, describes him as a deeply religious individual who is selfless and caring. "I remember several situations where when a Buddhist monk wanted to visit USA, Jaliya went out of his way to help them by providing necessary travel expenses and sometimes even taking care of their food and other requirements. I have also seen him helping lots of people who don't have basic living conditions met. He never helped them for any recognition. He always wanted to help them because he is a very kindhearted person and truly believes that the other person should not live as underprivileged in this society." (Letter from Ranil Liyanage).

Jaskaran Singh Sajjan describes the role that Mr. Wickramasuriya holds as a leader in his family: "The Wickramasuriya family is one of the kindest, loving, and most loyal families I have ever had the honor of getting to know. Much of that love and loyalty starts at the top with Uncle Jaliya. He is a role model for role models. He has been there for my family and I more times than

I could count – that's just who he is and by extension who his family is." (Letter from Jaskaran Singh Sajjan).

Mr. Wickramasuriya's daughter, Sarindee describes the respectful and loving man she knows her father to be: "I have seen his true character in the way he cares for my mother. The most loyal husband. The hardest working human. In a culture where women are not always given the same level of respect and opportunities as men, my thaththi showed me by example what a 50-50 partnership and marriage look like. He never cared about societal pressures or norms, but rather treated my mother as an equal and as a queen in every way." (Letter from Sarindee Wickramasuriya).

Mr. Wickramasuriya is a father figure beyond just his family.  Jaskaran Singh Sajjan describes the role Mr. Wickramasuriya plays in his life:

> When my mother received a scary health diagnosis in 2014, Sarindee and her father Jaliya were my first phone call, and they were the first to console me during one of the darkest times of my life. When I struggled to find a job after graduation, Mr. Wickramasuriya constantly checked-in to make sure there wasn't a way for him to help and to just make sure I was in good spirits. When I was unable to afford going home for the holidays and was 3,000 miles away from my parents and brother, Mr. Wickramasuriya would reach out to make sure I knew I had a family to spend time with, and for many years, I took him up on the offer.

(Letter from Jaskaran Singh Sajjan).

Mr. Wickramasuriya has also been dedicated to helping those around him however he can. Don Jayawera describes one such instance during a visit to Sri Lanka: "an employee came up to us and explained about a cancer diagnosis his wife – who was from one of the rural areas in the north central of the Island (Sri Lanka) – was facing. Jaliya gave him paid leave and donated money (I do not know the amount) saying to use that for medicine and doctors' expenses. A few months later, I found that his wife has been doing well with recovery." (Letter from Don Jayawera).

Meththa Nakandala also experienced Mr. Wickramasuriya's kindness and selflessness:

> [W]hen my father got sick with a multi-organ failure during the COVID-19 period, many hospitals in Sri Lanka were not admitting patients because most of the hospitals were full and did not have space. It was very hard to get someone admitted even if they were sick. However, even though Mr. Jaliya was in the USA at that time, he spoke to the Sri Lankan hospitals and somehow got my father admitted to one. Even though I eventually lost my father, during the two days that he was admitted, he was able to receive good treatment thanks to Mr. Jaliya. During this difficult period, he also took care of all the hospital bills and funeral arrangements for my father. Even for the office staff, he was very helpful during covid. He hired a private bus for the workers so that they would be safe when travelling to and from work. He also paid for the PCR/antigen testing of staff members during COVID-19. Additionally, time to time, food packs were distributed to the labourers to take home to their families as getting groceries was a challenge during this time.

(Letter from Meththa Nakandala).

In his role as ambassador, Mr. Wickramasuriya was known as hardworking, empathetic, and generous. As Channa Perera describes it, "He was so helpful and kind with all minor and support staff, maybe even more than with the diplomats. I have seen him mentioning how to treat others to his senior staff. He goes out of his way to help under-privileged people and anybody who needs help. . . The words I heard most from him were 'Thank you.' I have to say that Mr. Jaliya is a person full of empathy." (Letter from Channa Perera).

As Ambassador, Mr. Wickramasuriya went out of his way to help others. Gayan Hapugoda experienced this when he was in an accident where his spouse died and he went into a coma:

> As the Sri Lankan ambassador, Jaliya got personally involved in getting the necessary legal clearance to handle my wife's remaining[s] and my surgery.
> Further, he contacted the United States Embassy in Colombo, Sri Lanka to obtain visiting visa for my spouse's parents to participate in their child's funeral. He further assisted Sri Lankan community leaders in Atlanta and organized the relief work since I had no relative in Atlanta to manage the situation. An important thing to say is that at this time, I didn't know Ambassador Wickramasuriya personally, and had only met him at a couple of gatherings before. My in-laws had never seen or spoken to the Ambassador before this either. I found out later that he had spoken to the US Ambassador in Sri Lanka directly and given personal assurance and guaranteed that he is confident that my mother-in-law, father-in-law, and my deceased wife's brother will return back to Sri Lanka after attending to funeral and religious services.

(Letter from Gayan Hapugoda).

Mr. Wickramasuriya has also touched the lives of many through his work with the Sri Lankan community. He has been dedicated to supporting Sri Lankan causes. "He took on a leadership role during the 2004 Tsunami relief efforts by coordinating many projects in Sri Lanka." (Letter from Roham Dealwis). "[H]e has been an upstanding member of the Sri Lankan community. It's known that Jaliya willingly donated his time, skills, and money to develop the Georgia Buddhist Vihara." (Letter from Prasanna Bopitiya).

Despite the mental and emotional strain of these proceedings, Mr. Wickramasuriya has continued to be a valuable member of the Sri Lankan-American community. As Chandra Fernando puts it, "Even in these difficult times, Ambassador Wickramasuriya organized many valuable projects beneficial to both Sri Lanka and the US. He orchestrated business forums between the two countries, organized trade delegations, and addressed many groups of young American professionals and college students. He genuinely admired the people of the United States and tried to bring people together." (Letter from Chandra Fernando).

As Sanjeewa Weerwickrama writes, "I honestly believe that Jaliya has more works to be completed for his country, his people. He has to continue to take on the respected tradition of working towards supporting the under-privileged people of Sri Lanka. His tremendous skills and analytical capabilities in relation to local and international markets would vehemently nourish the young entrepreneurs in Sri Lanka and many other developing nations." (Letter from Sanjeewa Weerwickrama).

These examples and others recounted in the numerous letters submitted to this cCourt illustrate the kind of man Mr. Wickramasuriya truly is. Mr. Wickramasuriya's personal history and character demonstrate that the conduct that has brought him into the criminal justice system was an aberration from his long and distinguished career. Nevertheless, Mr. Wickramasuriya

understands the seriousness of the offense he committed and for that he is embarrassed and remorseful.

### *Mr. Wickramasuriya's Significant Medical Issues*

As the Court is aware, Mr. Wickramasuriya suffers from a number of serious health conditions which would be complicated by incarceration. There is a history of heart disease in his mother's side of the family.  His maternal grandfather died at 49 and his three maternal uncles died before attaining the age of 60.   Mr. Wickramasuriya inherited the heart problems.   He was diagnosed with high blood pressure and high cholesterol in his late 40s.  He suffered a heart attack in 2016 and was unconscious at the time he was admitted to the hospital.  He was hospitalized at the Critical Care Unit of the Sri Lankan National Hospital's Cardiology unit for two weeks.  He then remained in general care for several more weeks.

He lost vision in his eye as a result of his heart disease and has undergone a number of surgeries to correct his vision. Unfortunately, his vision is only 5% in one of his eyes.  He requires constant medical attention to maintain what little is left of his vision and to prevent loss of vision in his other eye.  He has been advised to keep his blood pressure level low and focus on avoiding stressful environments, as high stress will cause strain on the vessels in the eye.

B.    *The Nature and Circumstances of Mr. Wickramasuriya's Offense and the need for the sentence imposed to reflect the seriousness of the offense.*

Mr. Wickramasuriya accepts complete responsibility for his misconduct.  The nature and circumstances of his offense are undisputed and are fully described in the statement of facts. *See* Dkt. 61; *see also* PSR¶¶16-54.   For those reasons, this pleading will not go into great detail regarding topics covered in those submissions.

Mr. Wickramasuriya's conduct was and is inexcusable.  That said, it bears pointing out that this a non-violent offense.  Moreover, Mr. Wickramasuriya took immediate steps to atone for his

misconduct.  Mr. Wickramasuriya returned the funds in question in full to the Government of Sri Lanka.

While his extraordinary effort to pay restitution do not excuse his conduct or lessen the seriousness of the offense, itpresents a substantial mitigating factor that the Court should consider. The need to provide restitution is a statutorily-recognized factor to be considered at sentencing. *See* 18 U.S.C. § 3553(a)(7).  Extraordinary efforts to make early restitution constitute a valid basis for a departure or variance and can be considered by the Court when fashioning a sentence. [1] *United States v. Hairston*, 96 F.3d 102, 108 (4th Cir. 1996) (holding that "restitution, although taken into account in the guideline permitting a reduction for acceptance of responsibility, can provide a basis for a departure when present to such an exceptional degree that it cannot be characterized as typical or 'usual'" (citation omitted)).  Whether restitution in a particular case is extraordinary turns on factors such as the percentage of funds restored, the extent of the defendant's efforts at restitution, voluntariness, timing, and motive. *Id.* at 108-09; *see also United States v. Kim*, 364 F.3d 1235, 1244 (11th Cir. 2004) (explaining that, to determine whether restitution is extraordinary, "courts have looked to a wide range of factors, such as the degree of voluntariness, the efforts to which a defendant went to make restitution, the percentage of funds restored, the timing of the restitution, and whether the defendant's motive demonstrates sincere remorse and acceptance of responsibility").

---

[1]  The cited cases discuss the granting of a downward departure on the basis of restitution payment. To be clear, we are asking that the Court consider Mr. Wickramasuriya's extraordinary restitution efforts to sentence him to probation, the low end of the range.

Here, Mr. Wickramasuriya repatriated the funds shortly after receiving them, nearly nine years ago.  He appreciated the wrongfulness of his conduct and has accepted responsibility for his actions.

C.      *The Need to Avoid Unwarranted Disparity Among Similar Offenders*

While Mr. Wickramasuriya has committed serious crimes, we respectfully submit that a punishment similar to those imposed in other cases involving similar facts is appropriate.  As provided below, a sentence of probation would avoid any unwarranted disparity among similar offenders.

- *United States v. Young*, Case No. 19-CR-222 (D.C. 2019). Ronda M. Young pleaded guilty to fraudulently claiming that she was the victim of identity theft that resulted in a loss amount of $34,664.88 to at least 4 different financial institutions. Young admitted that she knowingly executed a scheme to defraud these financial institutions by submitting false claims of identity theft to avoid the payment of legitimately incurred debts for expenses such as international travel, a Mediterranean cruise, and furniture. Young, a federal employee of the Management & Program Analyst with the Department of Homeland Security, Customs and Border Protection, was subject to 5-year background investigations, and repeatedly lied about the identity theft investigations involving her actions, even after being advised of penalties for making a false statement pursuant to 18 U.S.C. 1001. Despite the egregious actions surrounding her case, Young was only sentenced to 2 years of probation and ordered to pay a fine of $2,000 and a restitution amount of $14,734.48;

- *United States v. Li,* Case No. 2015-cr-00870 (S.D.N.Y. 2015).  The district court sentenced Mr. Li to two years' probation and restitution in the amount of $56.8 million after he pleaded guilty to one count of securities fraud and one count of making a materially false statement for lying to investors and the SEC regarding the performance of his hedge fund, Canarsie Capital, LLC.

- *United States v. Johnson*, Case No. 18-Cr-778 (N.D. Ill. 2018) Retired Chicago Police Commander Kenneth Johnson illegally collected and spent more than $363,064 in social security checks that were intended for his deceased mother.  Johnson collected the checks for more than 20 years.  His guideline level was 15, resulting in an advisory guidelines level of 18-24 months.  He was sentenced to two years of probation despite the length of his criminal activity and egregiousness of the offense.

- *United States v. Deluca*, Case No. 2:20-cr-00148 (E.D. La. 2020). The district court sentenced Mr. Deluca to 36 months of probation after pleading guilty to one count of

conspiracy to commit health care fraud for submitting false and fraudulent claims for reimbursement to a federal health care benefit program affecting commerce, and other health care benefit programs. The defendant was also ordered to repay $777,000 in restitution.

- *United States v. Robinson*, Case No. 2:20-cr-20148 (W.D. Tenn 2020). The district court sentenced former Tennessee state senator, Ms. Robinson, to a year of probation after being convicted of two counts for using federal grant money on wedding expenses instead of the nursing school that it was intended for.

- *United States v. Godfrey-Smith*, Case No. 5:21-cr-00283 (E.D. La. 2021). The district court sentenced Ms. Godfrey-Smith to a year of probation after pleading guilty to one count of making and using a false document related to a multimillion-dollar fraud scheme.

- *United States v. VanScoyk*, Case No. 4:21-cr-01620 (D. Ariz. 2021). The district court sentenced Mr. VanScoyk to two years of probation and ordered him to pay a $5,000 fine after pleading guilty to conspiracy to commit wire fraud for his part in a Paycheck Protection Program fraud scheme to obtain two loans of $638,300 and of $594,830.

- *United States v. Offor*, Case No. 1:12-cr-00183 (W.D.N.Y. 2019). The district court sentenced Ms. Offor to three years of probation and ordered her to pay $134,172 in restitution after pleading guilty to conspiracy to commit wire fraud for her part in a scheme to defraud individuals who were seeking loans.

- *United States v. Smith*, Case No. 2:20-cr-00042 (S.D. Miss. 2020). The district court sentenced Mr. Smith to five years probation and ordered him to pay $494,444 in restitution after being convicted of filing a fake tax return. [2]

---

[2] *See also United States v. Broderson,* 67 F.3d 452, 458–59 (2d Cir. 1995) (affirming a district court's downward departure based in part on the defendant's restitution even though it could be justified "only as a 'discouraged departure'" given that, "[o]rdinarily, payment of restitution is not an appropriate basis for downward departure under Section 5K2.0 because it is adequately taken into account by Guidelines Section 3E1.1"); *United States v. Lieberman*, 971 F.2d 989, 996 (3d Cir. 1992*)* (affirming a district court's downward departure on the basis of the defendant's acceptance of responsibility as primarily demonstrated by his restitution);; *United States v. DeMonte,* 25 F.3d 343, 346 (6th Cir. 1994) (stating that "we have acknowledged that *voluntary* restitutionary payments may constitute 'exceptional circumstances' that justify a downward departure" (citing *United States v. Brewer*, 899 F.2d 503, 509 (6th Cir. 1990)(emphasis in original)); *United States v. Bean,* 18 F.3d 1367, 1369 (7th Cir. 1994) ("Undoubtedly there are circumstances that would justify using § 5K2.0 to [depart downward on the basis of restitution] beyond [the] two levels [of reduction provided by § 3E1.1]."); *United States v. Oligmueller,* 198 F.3d 669, 672 (8th Cir. 1999) (affirming a district court's downward departure on the basis of extraordinary restitution because "[w]e have previously held that cases can fall outside the heartland when there are extraordinary efforts at restitution" *(*citing *United States v. Garlich,* 951 F.2d 161, 163 (8th Cir. 1991))*; United States v. Miller,* 991 F.2d 552, 553-54 (9th Cir. 1993)

D.     *Adequate deterrence to criminal conduct*

We respectfully submit that a probationary sentence is more than adequate deterrence for a nonviolent crime like this, which occurred nine years ago.  Mr. Wickramasuriya will be branded a felon and will have to live with the stigma associated with a felony conviction.  Serving as even further deterrent is the fact that, as a non-US citizen, Mr. Wickramasuriya faces serious and adverse immigration consequences that could prevent him from returning to the United States for a very long time, if ever again.  In addition, given his guilty plea, he will likely have to face additional, and potentially drastic, consequences in Sri Lanka if and when he is forced to return. As the Court is likely aware, the economic and political situation in Sri Lanka is dire and many Sri Lankan's, including members of Mr. Wickramasuriya's family, are facing a very difficult situation.

We respectfully submit that there is no need to protect the public from potential future criminal conduct.  His character letters illustrate that Mr. Wickramasuriya is trustworthy and otherwise law abiding. This prosecution, and the negative press associated with it, has served as specifical deterrence.  In these circumstances, the requested sentence is fully consistent with the Court's statutory mandate to impose a sentence that is "sufficient, but not greater than necessary" to serve the purposes of federal sentencing.  We therefore respectfully submit that the appropriate sentence for Mr. Wickramasuriya is a period of 24 months of probation, consistent with the recommendation of the presentence report writer.[3]

---

(holding that district courts may depart downward on the basis of restitution when it (1) "shows acceptance of responsibility," (2) "was substantially greater than that contemplated by the Commission when drafting section 3E1.1," and (3) "the magnitude of the departure [is] commensurate with the level of the defendant's acceptance of responsibility").

[3] The government has requested a term of three years of supervised release.

## **CONCLUSION**

Based on the foregoing reasons and any others that may appear to the Court, Mr. Wickramasuriya respectfully submits that a sentence of probation described above is sufficient, but not greater than necessary, to comply with the statutory directives set forth in 18 U.S.C. § 3553(a).

Dated: July 13, 2022                                Respectfully submitted,

/s/ Danny C. Onorato
Danny C. Onorato (DC Bar No. 480043)
Stuart Sears (DC Bar No. 977144)
Schertler Onorato Mead & Sears, LLP
555 13th Street NW
Suite 500
Washington, D.C.  20004
Telephone: (202) 628-4199
Facsimile: (202) 628-4177
donorato@schertlerlaw.com
ssears@schertlerlaw.com

Amy Jeffress (DC Bar No. 449258)
Kaitlin Konkel (DC Bar No. 1021109)
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave. NW
Washington, DC 20001
Telephone: (202) 942-5000
Fax: (202) 942-5999
amy.jeffress@arnoldporter.com
kaitlin.konkel@arnoldporter.com

*Counsel for Jaliya Wickramasuriya*

## CERTIFICATE OF SERVICE

I hereby certify that on the 13th day of July 2022, I caused an electronic copy of the aforementioned memorandum and exhibits to the government:

Arvind K. Lal, Esq.
Assistant United States Attorney
United States Attorney's Office
for the District of Columbia

/s/ Danny C. Onorato
Danny C. Onorato (DC Bar No. 480043)
Schertler Onorato Mead & Sears, LLP
500 13th Street NW
Suite 500
Washington, D.C.  20004
Telephone: (202) 628-4199
Facsimile: (202) 628-4177

*Counsel for Jaliya Wickramasuriya*